Volume 1 of 2

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

APRIL REDDING, legal guardian of
minor child,

   *Plaintiff-Appellant,*

   v.

SAFFORD UNIFIED SCHOOL DISTRICT
#1; KERRY WILSON, husband; JANE
DOE WILSON, wife; HELEN ROMERO,
wife; JOHN DOE ROMERO, husband;
PEGGY SCHWALLIER, wife; JOHN
DOE SCHWALLIER, husband,

   *Defendants-Appellees.*

No. 05-15759

D.C. No.
CV-04-00265-NFF

OPINION

Appeal from the United States District Court
for the District of Arizona
Honorable Nancy Fiora, Magistrate Judge, Presiding

Argued and Submitted
March 26, 2008—San Francisco, California

Filed July 11, 2008

Before: Alex Kozinski, Chief Judge, Harry Pregerson,
Michael Daly Hawkins, Barry G. Silverman,
Kim McLane Wardlaw, Raymond C. Fisher,
Ronald M. Gould, Richard A. Paez, Carlos T. Bea,
Milan D. Smith, Jr., N. Randy Smith, Circuit Judges.

Opinion by Judge Wardlaw;
Dissents by Judges Gould and Hawkins

## COUNSEL

Graham A. Boyd, M. Allen Hopper, Adam B. Wolf, ACLU Foundation, Santa Cruz, California; Andrew J. Petersen (argued), Humphrey & Peterson, P.C., Tucson, Arizona; Bruce G. Macdonald, McNamara, Goldsmith, Jackson & Macdonald, Tucson, Arizona; Daniel Joseph Pochoda, ACLU of Arizona, Phoenix, Arizona, for the plaintiff-appellant.

Matthew W. Wright (argued), David K. Pauole, Holm Wright Hyde & Hays PLC, Phoenix, Arizona, for the defendants-appellees.

Carolyn I. Polowy, Sherri Morgan, National Association of Social Workers, Washington, D.C.; David A. Honzo, Julie M. Carpenter, Michael A. Hoffman, Jenner & Block LLP, Washington, D.C., for amici curiae The National Association of Social Workers and the National Association of Social Workers, Arizona Chapter.

Clint Bolick, The Rose Law Group, Scottsdale, Arizona; John W. Whitehead, Douglas R. McKusick, The Rutherford Institute, Charlottesville, Virginia, for amicus curiae The Rutherford Institute.

## OPINION

WARDLAW, Circuit Judge, with whom Judges PREGER-SON, FISHER, PAEZ, M. SMITH, and N.R. SMITH join:

On the basis of an uncorroborated tip from the culpable eighth grader, public middle school officials searched futilely for prescription-strength ibuprofen by strip-searching thirteen-year-old honor student Savana Redding. We conclude that the school officials violated Savana's Fourth Amendment right to be free from unreasonable search and seizure. The strip search of Savana was neither "justified at its inception," *New Jersey v. T.L.O.*, 469 U.S. 325, 341 (1985), nor, as a grossly intrusive search of a middle school girl to locate pills with the potency of two over-the-counter Advil capsules, "reasonably related in scope to the circumstances" giving rise to its initiation. *Id.* Because these constitutional principles were clearly established at the time that middle school officials directed and conducted the search, the school official in charge is not entitled to qualified immunity from suit for the unconstitutional strip search of Savana.

## I.   BACKGROUND

Nestled next to the Pinaleno Mountains in southeastern Arizona, Safford is a small community of slightly under 10,000 residents. With a modest population, Safford maintains a single middle school that draws additional students from other neighboring small towns. In the late summer of 2003, Savana began a new school year as an eighth grader at Safford Middle School along with approximately 200 other thirteen- and fourteen-year-old classmates.[1]

---

[1]As with many middle schools throughout our circuit, Safford Middle School educates sixth through eighth graders. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1430 (1986) (defining middle school as "a division in some private or public schools embracing or approximately embracing the upper elementary grades"). Traditionally, middle school students range in age from eleven to fourteen.

On October 8, Savana was attending math class when Assistant Principal Kerry Wilson opened the classroom door and instructed her to pack up her belongings and accompany him to his office. Savana complied, gathered her things and followed Wilson down the hallway. Upon arriving at Wilson's office, Savana noticed a planner that she had lent a few days earlier to her classmate, Marissa, sitting open on the assistant principal's desk. While Savana immediately recognized the planner, she had not previously seen the objects contained in the planner, including knives, a lighter and a cigarette. None of the objects belonged to Savana.

Wilson then began interrogating Savana. Wilson first reminded her of the importance of truth and asked her who owned the planner. Savana admitted that she owned the planner and had lent it to Marissa.[2] Upon further questioning, Savana insisted that none of the objects contained in the planner belonged to her.

Wilson then directed Savana's attention to a few small white ibuprofen pills sitting on his desk. Possession of these pills violated school rule J-3050's prohibition against bringing any prescription or over-the-counter drug onto campus without prior permission. He asked Savana if she had anything to do with the pills. Savana replied that she had never seen those pills before entering Wilson's office. Further, she assured Wilson that she had never brought any prescription pills into the middle school or provided any students with ibuprofen.

Dissatisfied with the results of his questioning, Wilson asked Savana whether he could search her belongings. Savana agreed to this search. Along with his administrative assistant, Helen Romero, Wilson rummaged through Savana's backpack and found nothing. Even though this first search of

---

[2]Savana had let Marissa use the planner because Marissa wanted to hide some things from her parents; specifically, cigarettes, a lighter and some jewelry.

Savana's backpack supported her statement that she had not brought pills onto campus, and despite Savana's discipline-free history at the school, Wilson asked Romero to take Savana to the nurse's office for a second, more thorough search.

There, at Wilson's behest, Romero and the school nurse, Peggy Schwallier, conducted a strip search of Savana. The officials had Savana peel off each layer of clothing in turn. First, Savana removed her socks, shoes and jacket for inspection for ibuprofen. The officials found nothing. Then, Romero asked Savana to remove her T-shirt and stretch pants. Embarrassed and scared, Savana complied and sat in her bra and underwear while the two adults examined her clothes. Again, the officials found nothing. Still progressing with the search, despite receiving only corroboration of Savana's pleas that she did not have any ibuprofen, Romero instructed Savana to pull her bra out to the side and shake it. Savana followed the instructions, exposing her naked breasts in the process. The shaking failed to dislodge any pills. Romero next requested that Savana pull out her underwear at the crotch and shake it. Hiding her head so that the adults could not see that she was about to cry, Savana complied and pulled out her underwear, revealing her pelvic area. No ibuprofen was found. The school officials finally stopped and told Savana to put her clothes back on and accompany Romero back to Wilson's office. Savana did not freely agree to this search. She was "embarrassed and scared, but felt [she] would be in more trouble if [she] did not do what they asked." In her affidavit, Savana described the experience as "the most humiliating experience" of her short life, and felt "violated by the strip search."

The long and attenuated route to Savana began at the school dance held to celebrate the beginning of the new academic year. There, school officials detected the smell of alcohol around a small group of students, including Savana and her classmate Marissa, and became concerned that they may

have drunk alcohol either before or during the school function. Increasing their suspicion of alcohol use that night, school officials found a bottle of alcohol, along with a pack of cigarettes, in the girls' bathroom. Nothing, however, specifically linked Savana or any other individual student to the empty bottle. Nevertheless, school officials remained wary that students were violating school rule J-3050, which prohibits the possession of alcohol and the non-medical use, possession, or sale of a drug, among other school rules. Enforcement of these school regulations drove the public school officials' increased efforts toward rooting out the ibuprofen.

On October 1, nearly a month and a half after the dance, and a week before the search of Savana, Jordan, a student at Safford Middle School, and his mother requested a meeting with Principal Robert Beeman and Wilson. During the meeting, Jordan's mother recounted how her son had become violent and gotten sick to his stomach a few nights earlier. Jordan had confessed to his mother that he became sick after ingesting pills he received from some unspecified classmate. More generally, Jordan advised the school administrators that "certain students" brought drugs and weapons on campus. Nothing in the record indicates that Jordan suggested Savana was among the students bringing drugs into the middle school. To the contrary, Jordan brought up Savana's name only to accuse her family of providing alcohol to other students before the opening dance, an allegation the Reddings deny.[3]

Before the opening bell on the day of the strip search, Jordan approached Assistant Principal Wilson with a small white pill. Jordan explained that Marissa—he did not mention

---

[3]Because the School District brought the motion for summary judgment, we must construe the record in the light most favorable to the Reddings. *See Bank of New York v. Freemont Gen. Corp.*, 523 F.3d 902, 909 (9th Cir. 2008) ("[W]e must view the evidence on summary judgment in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party.").

Savana's name—had just given him the pill, and that a group of students planned to take the pills at lunchtime. Consistent with events he recounted during his meeting with Wilson the previous week, Jordan did not link Savana with possession of any pills or the plan for their distribution that day. Wilson then walked down the hall to ask Nurse Schwallier if she could identify the pill. Schwallier recognized it as 400 mg ibuprofen, obtainable only by prescription. Ibuprofen is most commonly found in over-the-counter Advil or Motrin in 200 mg pills to treat headaches, muscle-aches, or, for many young women, menstrual cramps. *See* PDR for NONPRESCRIPTION DRUGS, DIETARY SUPPLEMENTS, AND HERBS 725-26 (29th ed. 2008).

Wilson then walked toward Marissa's classroom to question her about the ibuprofen. Interrupting the class, Wilson asked Marissa to gather her things and accompany him to his office. As Marissa collected her belongings, Wilson noticed a black planner in the desk situated next to her. He asked the classroom teacher to determine the owner of the planner. Opening the planner, the classroom teacher found small knives, a cigarette lighter and a cigarette. No pills, however, were found in the planner. Wilson took the planner and Marissa to his office.

Once back in his office, Wilson asked Romero to observe while Marissa followed Wilson's direction to turn out her pockets and open her wallet. This search revealed several white ibuprofen pills identical to the one turned over by Jordan, along with a blue Naprosyn 200 mg pill.[4] Wilson asked Marissa how she obtained the blue pill. Caught red-handed with pills in violation of school rules, Marissa responded, "I guess it slipped in when *she* gave me the IBU 400s." Wilson

---

[4]Naprosyn, like ibuprofen, is used to treat pain and inflammation. *See* PHYSICIAN'S DESK REFERENCE 2725 (62nd ed. 2008). It is most commonly found in Aleve, a popular over-the-counter choice to treat discomfort related to menstrual cramps.

asked, "Who is *she*?" Marissa responded "Savana Redding." Marissa, however, did not indicate to Wilson that Savana currently had any pills on her person, or, more specifically, had hidden pills in a place where a strip search would locate them.

Wilson then asked Romero to escort Marissa down to Nurse Schwallier's office for a more intensive search for additional ibuprofen pills. Romero asked Marissa to remove her socks and shoes so that they could be searched. Marissa complied. Then Romero asked Marissa to pull up her shirt and pull out the band of her bra. Finding nothing, Romero lastly asked Marissa to take off her pants and stretch out the elastic on her underwear. The search failed to reveal any additional ibuprofen.[5] After this search, Wilson and the school officials turned their attention to Savana.

The crucial link—indeed, the only link—between Savana and the ibuprofen was Marissa's statement upon being caught with the pills that the ibuprofen (and the blame) was not hers, but rather was Savana's. Before Marissa implicated Savana, there had been no connection between Savana and the circulating rumors of prescription drugs on campus. Savana had never been disciplined for any infraction of school rules, let alone possession or distribution of drugs. The tip provided by Jordan only linked Marissa to the ibuprofen and failed to include any mention of Savana. Indeed, even the planner Savana lent to Marissa failed to provide any connection between Savana and any ibuprofen because the pills had been found on Marissa's person, not inside the planner. Nevertheless, on the sole basis of Marissa's attempt to shift the school officials' focus off herself and onto Savana, and without addi-

---

[5]Inexplicably, although Marissa was the one found with the pills, the search conducted on Marissa was less intrusive than that later conducted on Savana, whose only link to the pills was Marissa's uncorroborated "tip." School officials asked Marissa only to lift her shirt, not to remove it entirely, as they did with Savana. The third student suspect was a boy named Chris. He was the only student suspected of the same infraction that day not required to strip for the school officials' inspection.

tional questioning or investigation, Wilson directed his assistant and the school nurse to require a thirteen-year-old to disrobe.

Upset after hearing what happened to her daughter, April Redding, Savana's mother, made an appointment with the school administrators. Apparently unsatisfied by the meeting, the Reddings brought suit in the District Court for the District of Arizona against Safford Unified School District #1, Wilson, Romero and Schwallier (collectively, "Appellees").

Appellees ultimately filed a motion for summary judgment, asserting that the defense of qualified immunity precluded them from suit. Defendants' motion relied solely on the argument that the strip search did not violate Savana's Fourth Amendment rights, and "because there was no constitutional violation, no further inquiry is necessary." In a series of declarations, Wilson, Romero and Schwallier attempted to justify the strip search of Savana with a general concern that "[t]he school has a history of problems with students using and distributing prohibited and illegal substances on campus," and a uniform recounting of events—none of which remotely connected Savana with the presence of ibuprofen on the middle school campus that day.

The district court ruled for defendants entirely on the basis that there was no violation of Savana's constitutional right, as established by *T.L.O.*, to be free from unreasonable searches in school. It accepted as sufficient Appellees' representation that Savana's decision to lend Marissa her planner provided a sufficient nexus between the two girls to corroborate Marissa's tip. The district court reasoned that this connection justified the strip search at its inception by providing Appellees with reasonable grounds for suspecting that a strip search of Savana would turn up the ibuprofen. Moreover, the district court concluded that the need to locate the ibuprofen was sufficiently urgent that the strip search was "reasonably related" to the search's objective and was not "excessively intrusive."

The conclusion that Savana's constitutional rights were not violated rendered consideration of the second step of qualified immunity—whether the right was clearly established—unnecessary.

Upon appeal, a divided panel of our court upheld the grant of summary judgment in favor of Appellees. The two-judge majority—in a now vacated opinion—concluded that "[a]mple facts supported Marissa's veracity as an informant," justifying Wilson's subsequent search of Savana, including her ownership of the planner and the disputed allegations of her distribution of alcohol to students. *Redding v. Safford Unified Sch. Dist. #1*, 504 F.3d 828, 834 (9th Cir. 2007), *r'hg en banc granted*, 514 F.3d 1383. The majority found the strip search permissible in scope because "the strong interest" in protecting students from prescription drugs outweighed the intrusion caused by the search the panel thought was conducted in a "reasonable manner." In dissent, Judge Thomas asserted that the majority had misapplied Supreme Court authority. While *a* search may have been justified, the panel failed to undertake "the appropriate inquiry [of] whether a *strip search* was justified." *Id.* at 837 (Thomas, J. dissenting). Because it "was unreasonable to force Savana, a thirteen-year-old girl, to expose her breasts and pubic area to school officials" while they searched for ibuprofen, Judge Thomas concluded that the strip search failed to meet constitutional muster under *T.L.O. Id.* at 838.

A majority of our judges in regular active service voted to reconsider en banc whether the strip search violated Savana's Fourth Amendment rights, and, if so, whether those rights were clearly established in October 2003, when the school officials conducted the strip search. *See* FED. R. APP. P. 35. We now consider these questions en banc.

## II. DISCUSSION

The Supreme Court has instructed that lower courts follow a careful two-step process when evaluating assertions of qualified immunity. *Saucier v. Katz*, 533 U.S. 194, 200 (2001). First, we determine whether "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right." *Clement v. Gomez*, 298 F.3d 898, 903 (9th Cir. 2002) (quoting *Saucier*, 533 U.S. at 201). If we answer that question in the affirmative, we then answer whether the violated right was "clearly established."[6] *Id.* We review de novo the district court's grant of summary judgment on the basis of qualified immunity. *Blankenhorn v. City of Orange*, 485 F.3d 463, 470 (9th Cir. 2007).

### A.  *The Constitutionality of the Strip Search*

In 1985, the United States Supreme Court held: "It is now beyond dispute that the Federal Constitution, by the virtue of the Fourteenth Amendment, prohibits unreasonable searches and seizures by state officers. Equally indisputable is the proposition that the Fourteenth Amendment protects the rights of students against encroachment by public school officials." *T.L.O.*, 469 U.S. at 334 (internal quotation marks and citations omitted). The Court stated "[t]hat [schools] are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere

---

[6]Because the district court and the majority of the three judge panel decided that a constitutional right was not violated, we, sitting en banc, are required to decide that question. It is of no consequence at this juncture of the appeal in which order the *Saucier* questions are addressed. It is not necessary, therefore, to defer decision pending the Supreme Court's decision whether to overrule *Saucier*'s two-step inquiry. *See Pearson v. Callahan*, __ S. Ct. __, 2008 WL 754340 (Mar. 24, 2008).

platitudes." *Id*. (citing *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943)).

**[1]** To implement these principles, the Court established "the proper standard for assessing the legality of searches conducted by public school officials." *Id*. at 328. Whether school officials subject a student to a search of her purse, as in *T.L.O.*, or strip a student of clothing, the Constitution mandates that the search meet the generalized requirement of "reasonableness, under all the circumstances, of the search." *Id*. at 341. The Court recognized that what is reasonable requires a balancing of interests: "On one side of the balance are arrayed the individual's legitimate expectations of privacy and personal security; on the other, the government's need for effective methods to deal with breaches of public order." *Id*. at 337. Noting that "even a limited search of the person is a substantial invasion of privacy," *id*. (citing *Terry v. Ohio*, 392 U.S. 1, 24-25 (1968)), the Court emphasized that "[a] search of a child's person or of a closed purse or other bag carried on her person, no less than a similar search carried out on an adult, is undoubtedly a severe violation of subjective expectations of privacy." *Id*. at 337-38. Weighed against the students' substantial interest in privacy is the "substantial interest of teachers and administrators in maintaining discipline in the classroom and on school grounds."[7] *Id*. at 339. To accommodate the school context, the Court concluded that the "public interest is best served by a Fourth Amendment standard of reasonableness that stops short of probable cause." *Id.* at 341.

**[2]** The Court set forth a twofold inquiry to gauge reasonableness: "[F]irst, one must consider 'whether the . . . action

---

[7]Judge Hawkins's dissenting opinion gives little weight to the substantial privacy interests of the child identified by the Supreme Court, focusing almost entirely on the school's interest in order. Yet the Supreme Court instructed that the reasonableness standard involved two equally important goals: preserving the school's need for order while ensuring that the "interests of students would be invaded no more than is necessary" to preserve such order. *Id*. at 343.

was justified at its inception;' second, one must determine whether the search as actually conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place.' " *Id.* (citations omitted). The Court further held that a search will be permissible in its scope "when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.* at 342. The Court crafted this test to "neither unduly burden the efforts of school authorities to maintain order in their schools nor authorize unrestrained intrusions upon the privacy of schoolchildren." *Id.* at 342-43.

While Judge Hawkins's dissenting opinion characterizes *T.L.O.*'s standard as designed to "spare teachers and school officials the necessity of schooling themselves in the niceties of probable cause and permit them to regulate their conduct according to the dictates of reason and common sense," Hawkins Dissent *infra* at 8456, it pays scant attention to the critically important statement of the Court that immediately follows this quoted sentence in the *T.L.O.* opinion: "*At the same time*, the reasonableness standard should ensure that the interests of students will be invaded no more than is necessary to achieve the legitimate end of preserving order in the schools." *Id.* at 343 (emphasis added).

Nowhere does the *T.L.O.* Court tell us to accord school officials' judgments unblinking deference. Nor does *T.L.O.* provide blanket approval of strip searches of thirteen-year-olds remotely rumored to have had Advil merely because of a generalized drug problem. Rather, the Court made it clear that while it did not require school officials to apply a probable cause standard to a purse search, it plainly required them to act "according to the dictates of reason and common sense." *Id.* As discussed below, the public school officials who strip searched Savana acted contrary to all reason and common sense as they trampled over her legitimate and substantial interests in privacy and security of her person.

*1.   Public School Officials Conducted a Strip Search of Savana.*

**[3]** Let there be no doubt: the Safford school officials conducted a strip search of Savana. Judge Hawkins's dissenting opinion squeamishly avoids facing the reality of the nature of the search. Our designation of Savana's search as a strip search is supported by federal and state law, as well as secondary authority. Savana did not have to be completely naked for the school officials to have strip searched her. The Eleventh Circuit has considered a police officer's direction for someone to strip down to their underwear to be a "strip search." *See Justice v. City of Peachtree City*, 961 F.2d 188, 190 (11th Cir. 1992). Likewise, the Fourth Circuit understands a search of an adult arrestee in his boxer shorts to be a strip search. *See Amaechi v. West*, 237 F.3d 356, 363 (4th Cir. 2001) (citing *United States v. Dorlouis*, 107 F.3d 248, 256 (4th Cir. 1997)). The First Circuit "recognize[s] that a strip search may occur even when an inmate is not fully disrobed." *See Wood v. Hancock County Sheriff's Dep't.*, 354 F.3d 57, 63 n.10 (1st Cir. 2003).

Statutes defining a strip search in several states confirm our understanding of the term "strip search." California, for instance, defines the term as "requir[ing] a person to remove or arrange *some or all* of his or her clothing so as to permit a visual inspection of the *underclothing*, breasts, buttocks, or genitalia of such person." CAL. PENAL CODE § 4030 (emphasis supplied); *see also, e.g.*, CONN. GEN. STAT. § 54-33k; 725 ILL. COMP. STAT. 5/103-1; MO. REV. STAT. § 544.193; N.J. STAT. ANN. 2A:161A-3; VA. CODE ANN. § 19.2-59.1; WASH. REV. CODE § 10.79.070. The Fourth Circuit has recognized that this definition of a strip search is "uniform" throughout the Union. *See Amaechi*, 237 F.3d at 365 n.15.

*Black's Law Dictionary* defines a 'strip search' as "[a] search of a person conducted after that person's clothes have been removed, the purpose usually being to find any contra-

band the person might be hiding." *See* Black's Law Dictionary 1378-79 (8th ed. 2004).

Savana was required by the public school officials to disrobe and expose the parts of her body underneath her underwear so that school officials could potentially find ibuprofen. The term may unsettle the sensibilities of our dissenting colleagues; however, the accuracy of the designation merely cements the intrusiveness of what occurred. And, even if our dissenting friends want to quibble about the term, the search of Savana by any other name would be equally as unreasonable.

### 2.    *Was the Strip Search Justified at Its Inception?*

**[4]** "Under ordinary circumstances, a search of a student by a teacher or other school official will be 'justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." *T.L.O.*, 469 U.S. at 341-42. Reasonableness, of course, depends on context. We agree with the Seventh Circuit that *T.L.O.* requires that "as the intrusiveness of the search of a student intensifies, so too does the standard of Fourth Amendment reasonableness. What may constitute reasonable suspicion for a search of a locker or even a pocket or pocketbook may fall well short of reasonableness for a nude search."[8] *Cornfield by Lewis v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1321 (7th Cir. 1993). The Second Circuit also agrees with this approach: "Although *T.L.O.* held that reasonable suspicion is the governing standard, the reasonableness

---

[8]Notably, at least seven states—including two in this Circuit—have concluded that strip searches of schoolchildren are *never* permissible for *any* reason. *See* Cal. Educ. Code § 49050; Iowa Code § 808A.2(4)(a); Okla. Stat. tit. 70, § 24-102; N.J. Stat. Ann. § 18A:37-6.1; S.C. Code Ann. § 59-63-1140; Wash. Rev. Code § 28A.600.230(3); Wis. Stat. § 948.50(3).

of the suspicion is informed by the very intrusive nature of a strip search, requiring for its justification a high level of suspicion." *Phaneuf v. Fraikin*, 448 F.3d 591, 596 (2d Cir. 2006) (citation omitted).

Here, as in *T.L.O.*, the school officials engaged in two related searches: first, a search of Savana's backpack and her pockets, which does not give rise to the claims in the complaint, and second, a strip search, which forms the basis of the complaint.[9] *See T.L.O.*, 469 U.S. at 345 ("The incident that gave rise to this case actually involved two separate searches, with the first—the search for cigarettes—providing the suspicion that gave rise to the second—the search for marihuana."). A review of the facts found in *T.L.O.*, and the Court's reasoning regarding the progression of the first search of T.L.O. to the second, supports the conclusion that while reasonable suspicion may very well have justified the initial search of Savana's backpack and the emptying of her pockets, it was unreasonable to proceed from this first search to a strip search.

In *T.L.O.*, a high school teacher discovered two girls smoking in a lavatory in violation of a school rule. 469 U.S. at 328. In response, the teacher brought the two girls down to the principal's office to discuss the infraction with the high school's vice principal. While T.L.O.'s friend admitted to smoking, in violation of a school rule, T.L.O. denied the allegation. *Id*. To determine whether to believe the denial, the vice principal brought T.L.O. into his private office and asked to see her purse. *Id*. As he opened the purse, the vice principal found a pack of cigarettes. *Id.* Reaching in for the cigarettes, the vice principal further discovered a package of rolling papers, closely associated with the use of marijuana. *Id.*

---

[9]That the dissent chooses to merge the two searches into one with an increasing degree of intrusiveness does little to advance the analysis of *T.L.O.* and its application to the strip search here.

Having discovered indications that T.L.O.'s previous denial was false and that she possessed drug paraphernalia, the vice principal began a second and more intrusive search of T.L.O.'s purse. *Id.* This second search revealed "a small amount of marihuana, a pipe, a number of empty plastic bags, a substantial quantity of money in one-dollar bills, an index card that appeared to be a list of students who owed T.L.O. money, and two letters that implicated T.L.O. in marihuana dealing." *Id.*

The Court reasoned that the initial search of T.L.O.'s purse was reasonable because a teacher had reported that this particular student was smoking in the bathroom. *Id* at 345-46. This report gave the vice principal reason to suspect T.L.O. had cigarettes on her person, and "if she did have cigarettes, her purse was the obvious place in which to find them." *Id.* at 346. This first search revealed not only corroboration of the vice principal's suspicion that T.L.O. was carrying cigarettes, but, by the discovery of rolling papers, also provided additional reasonable suspicion that T.L.O. may possess marijuana, thereby justifying a second, more intrusive search. Because the first search revealed information that supported reasonable suspicion that she possessed contraband, the Court concluded that "further exploration of T.L.O's purse" was justified. *Id.* at 347.

The causal link permitting the vice principal to proceed from his first, less intrusive search to a second, more thorough search—the discovery of cigarettes and rolling papers—is entirely absent here. The initial search of Savana's backpack (which, like T.L.O.'s purse, were "the obvious place[s]" to find pills) did not turn up any ibuprofen. The *T.L.O.* Court concluded that the second search was reasonable because the preliminary search provided physical evidence supporting the vice principal's suspicion. Of course, the discovery of cigarettes also provided the vice principal with good reason to discount the veracity of T.L.O.'s denials. Here no such causal link existed. To the contrary: the initial search of Savana

revealed nothing to suggest she possessed pills or that she was anything less than truthful when she emphatically stated she had never brought pills into the school. Following the logic of *T.L.O.*, the initial search of Savana's backpack and her pockets may have been constitutionally permissible. That initial search, however, is not the search currently before us. Rather, we must analyze whether the subsequent strip search was justified at *its* inception.

**[5]** Absent the sort of physical evidence found in *T.L.O.*, the primary purported justification for the strip search was Marissa's statement that Savana had given her the ibuprofen that she was caught with in violation of the school's rule. This self-serving statement, which shifted the culpability for bringing the pills to school from Marissa to Savana, does not justify initiating a highly invasive strip search of a student who bore no other connection to the pills in question. We do not treat all informants' tips as equal in their reliability. *See Adams v. Williams*, 407 U.S. 143, 147 (1972). Rather, "[w]hen a court is considering whether an informant's tip is sufficient to support a finding of probable cause or reasonable suspicion, the court must employ a 'totality-of-the-circumstances approach' that takes into consideration the informant's 'veracity' or 'reliability' and his 'basis of knowledge.' " *United States v. Rowland*, 464 F.3d 899, 907 (9th Cir. 2006). For good reason, we are most suspicious of those self-exculpatory tips that might unload potential punishment on a third party. *See Lilly v. Virginia*, 527 U.S. 116, 133 (1999) ("It is clear that our cases consistently have viewed an accomplice's statements that shift or spread the blame to a criminal defendant as falling outside the realm of those [categories of trustworthy statements]."). Our concerns are heightened when the informant is a frightened eighth grader caught red-handed by a principal. This is particularly so when the student implicates another who has not previously been tied to the contraband and, more generally, has no disciplinary history whatsoever at the school. More succinctly, the self-serving statement of a cornered teenager facing significant punish-

ment does not meet the heavy burden necessary to justify a search accurately described by the Seventh Circuit as "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant [and] embarrassing." *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1272 (7th Cir. 1983).

**[6]** At a minimum, Assistant Principal Wilson should have conducted additional investigation to corroborate Marissa's "tip" before directing Savana into the nurse's office for disrobing. *See Williams by Williams v. Ellington*, 936 F.2d 881, 888-89 (6th Cir. 1991) ("While there is concern that students will be motivated by malice and falsely implicate other students in wrongdoing, that type of situation would be analogous to the anonymous tip. Because the tip lacks reliability, school officials would be required to further investigate the matter before a search or seizure would be warranted."); *Phaneuf*, 448 F.3d at 598-99 ("While the uncorroborated tip no doubt justified additional inquiry and investigation by school officials, we are not convinced that it justified a step as intrusive as a strip search."). This need for further investigation is particularly heightened here because the initial tip provided no information as to whether Savana currently possessed ibuprofen pills or was hiding them in a place where a strip search would reveal them. *See T.L.O.*, 469 U.S. at 346 (recognizing distinction between reasonable places to search —such as purses—and other, less reasonable places). Several avenues were available for Wilson to follow up on Savana's general statement, including discussions with Savana's teachers, conversations with Savana's parents, or further questioning of other students. Certainly, the only "corroboration" Wilson received—Savana's adamant denial of possessing ibuprofen and a fruitless search of her backpack—did not serve to bolster the tip's reliability to a degree sufficient to justify a further and more intrusive search.

Nor are we persuaded that either Savana's admission that she lent Marissa the planner or any disputed allegation that she served alcohol six weeks before Marissa was found with

the pills provided reasonable grounds to believe that a strip search of Savana would reveal ibuprofen. The planner that Savana lent to Marissa had not been used by Marissa to conceal ibuprofen. The ibuprofen, rather, had been concealed in Marissa's pockets, consistent with the information provided by Jordan linking Marissa alone to the ibuprofen.[10] That Savana lent a planner to Marissa—in which Marissa concealed objects that violated Safford school rules—does not make it significantly more likely that Savana had anything to do with the pills carried in Marissa's pockets. Judge Hawkins's dissenting opinion appears satisfied that the planner cements Savana's friendly relationship with Marissa, and therefore makes Savana's involvement in pill distribution more likely. This is nothing more than "guilt-by-association," certainly too thin of a reed for such a substantial intrusion into Savana's expectations of privacy. *See Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 178 (1951) ("The technique is guilt by association—one of the most odious institutions of history . . . . Guilt in our system is personal."). Moreover, Marissa's compounding number of school rule violations should reasonably have cast more suspicion on her own culpability, further undermining the reliability of her accusation of Savana. Further, Savana's mother had denied the family's involvement in providing alcohol to any student before the August school dance.[11] Nevertheless, even if Savana had provided alcohol to students in August, that event does not make it more likely that an October strip search

---

[10]Judge Hawkins inconsistently embraces Jordan's credibility when it serves his cause of attempting to discredit Savana with the months-earlier alcohol allegation but is quick to dismiss Jordan when his statements support Savana's credibility and complete innocence. The dissent accepts Jordan's recollection of Savana's party a month and a half earlier to suggest that Savana provided students with alcohol, yet does not give the same force to Jordan's statement that earlier that very day Marissa—and not Savana—had given him the ibuprofen.

[11]Again, because we accept the facts of the party opposing qualified immunity to determine whether a constitutional violation could be found, we credit this account of events. *Saucier*, 533 U.S. at 201.

would reveal ibuprofen pills hidden in Savana's underwear. *See Phaneuf*, 448 F.3d at 600 ("The school acted unreasonably in treating all contraband alike: Surely, a discovery of cigarettes cannot alone support a suspicion that a student is carrying a firearm or is bootlegging gin. Without further explanation, the school cannot vault from the finding of one type of (commonly used) contraband, to a suspicion involving the smuggling of another.").

Comparing the facts leading to Savana's strip search to justifications offered for similar searches examined by our sister circuits further bolsters our conclusion that this strip search was not justified at its inception. In *Cornfield*, the Seventh Circuit found justifiable at its inception a strip search of a sixteen-year-old male enrolled in a high school behavioral disorder program. 991 F.2d at 1319. There, a disinterested teacher's aide observed that the student was "too well-endowed," suggesting that the student might be "crotching" drugs. *Id*. Information from third parties buttressed this observation, including another student's report that Cornfield had brought drugs onto campus, and a teacher's report that Cornfield admitted he had previously dealt drugs as well as "crotched" drugs during a police raid at his mother's house. *Id.* at 1322. Moreover, the local police had reported to the school that they received information that Cornfield was selling marijuana to other students. *Id*. Perhaps most importantly, the information provided a basis to believe that a strip search was necessary to reveal the contraband. These factors—teacher observations indicating the contraband was hidden in Cornfield's underwear, tips from impartial students, police reports, and previous student admissions—all distinguish Cornfield's search from that of Savana, whose only tie to the ibuprofen in question was Marissa's statements, which in this context, were unreliable.

Indeed, in *Phaneuf*, the Second Circuit struck down as unjustified a strip search of an eighteen-year-old girl as unjustified with facts far more favorable to the school officials than

those present here. There, a disinterested student provided a tip to a teacher that Phaneuf, a student with a history of disciplinary problems, planned to stuff marijuana down her pants that day to take along with her on the senior class picnic. *Phaneuf*, 448 F.3d at 593. Although the school had a specific tip that the student was currently hiding drugs where only a strip search could discover them, and the school called the student's mother to perform the search, the Second Circuit determined that a student tip, even when not seeking to shift blame, justified only further inquiry and not a "step as intrusive as a strip search." *Id.* at 599. The circumstances the public school officials confronted here provided even less justification than those rejected in *Phaneuf*, considering the source of the tip, the content of the tip (including no information that Savana currently possessed pills in a place where a strip search would reveal them) and the history of the student in question.

**[7]** The school initiated a strip search of Savana on the basis of an unsubstantiated tip from Marissa, a student seeking to shift blame from herself to Savana. Other facts marshaled by the school district—allegations of alcohol use months earlier, Jordan's tip that Marissa provided him with a pill, and Marissa's hidden contraband in a planner Savana lent her—are logically unrelated to a reasonable belief that Savana was hiding pills on her person. For these reasons, we hold that the strip search of Savana was unjustified at its inception.

### 3.    Was the Strip Search Reasonable in Scope?

**[8]** Nor was the strip search "reasonably related in scope to the circumstances which justified the interference in the first place." *T.L.O.*, 469 U.S. at 341 (internal quotation mark and citation omitted). The scope of a search is permissible only if "the measures adopted are reasonably related to the objectives of the search and *not excessively intrusive in light of the age and sex of the student and the nature of the infraction.*" *Id.* at 342 (emphasis added). Here, the public school authorities

adopted a disproportionately extreme measure to search a thirteen-year-old girl[12] for violating a school rule prohibiting possession of prescription and over-the-counter drugs. We conclude the strip search was not reasonably related to the search for ibuprofen, as the most logical places where the pills might have been found had already been searched to no avail, and no information pointed to the conclusion that the pills were hidden under her panties or bra (or that Savana's classmates would be willing to ingest pills previously stored in her underwear). Common sense informs us that directing a thirteen-year-old girl to remove her clothes, partially revealing her breasts and pelvic area, for allegedly possessing ibuprofen, an infraction that poses an imminent danger to no one, and which could be handled by keeping her in the principal's office until a parent arrived or simply sending her home, was excessively intrusive.

[9] Along with our sister circuits, we have long recognized the psychological trauma intrinsic to a strip search. "The feelings of humiliation and degradation associated with forcibly exposing one's nude body to strangers for visual inspection is beyond dispute." *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1446 (9th Cir. 1989) (challenging a strip search of an adult after arrest for grand-theft auto). As the Tenth Circuit has explained, "[t]he experience of disrobing and exposing one's self for visual inspection by a stranger clothed with the uniform and authority of the state . . . can only be seen as thoroughly degrading and frightening." *Chapman v. Nichols*, 989 F.2d 393, 396 (10th Cir. 1993) (challenging strip search policy of Oklahoma jail). That Savana's search took place in a nurse's office in front of two women does not remove the

---

[12]*T.L.O.* requires us to measure the intrusiveness of the search in light of the "age and *sex*" of the student. Here, the gender of the students suspected of possessing ibuprofen did make a difference: only the girls were asked to disrobe. Chris, a male student, was asked only to empty his pockets, shake out his shirt and shake his pants up and down. That Savana was subjected to a *more* intrusive search than that deemed necessary for the boy renders it all the more unreasonable.

sting of the procedure. *See Hunter v. Auger*, 672 F.2d 668, 674 (8th Cir. 1982) ("Indeed, a strip search, regardless how professionally and courteously conducted, is an embarrassing and humiliating experience.").

**[10]** These concerns, pressing and legitimate when strip searches are conducted on adults in prison, are magnified when strip searches are performed on schoolchildren. As the Supreme Court has noted: "[Y]outh is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage." *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982). As adolescents enter puberty, "they become more conscious of their bodies and self-conscious about them. Consequently, the potential for a search to cause embarrassment and humiliation increases as children grow older." *Cornfield*, 991 F.2d at 1321 n.1. "[N]o one would seriously dispute that a nude search of a child is traumatic." *Id.* at 1321.

As Amicus National Association of Social Workers informs us, psychological research supports these judicial observations. "Clinical evaluations of the [young] victims of strip searches indicate that they can result in serious emotional damage, including the development of, or increase in, oppositional behavior." Irwin A. Hyman & Donna C. Perone, *The Other Side of School Violence: Educator Policies and Practices that May Contribute to Student Misbehavior*, 36 J. SCHOOL PSYCHOLOGY 7, 13 (1998). "Psychological experts have also testified that victims often suffered post-search symptoms including sleep disturbance, recurrent and intrusive recollections of the event, inability to concentrate, anxiety, depression and development of phobic reactions, and that some victims have been moved to attempt suicide." Stephen F. Shatz et al., *The Strip Search of Children and the Fourth Amendment*, 26 U.S.F. L. REV. 1, 12 (1991) (internal quotation marks omitted). Moreover, that the student is "viewed rather than touched, do[es] not diminish the trauma experienced by the child." Jess Ann White, *A Study of Strip Search-*

*ing in Pennsylvania Public Schools and an Analysis of the Knowledge, Attitudes, and Beliefs of Pennsylvania Public School Administrators Regarding Strip Searching* 37 (2000) (on file with the Temple University Graduate Board). The overzealousness of school administrators in efforts to protect students has the tragic impact of traumatizing those they claim to serve.

**[11]** And all this to find prescription-strength ibuprofen pills. We reject Safford's effort to lump together these run-of-the-mill anti-inflammatory pills with the evocative term "prescription drugs," in a knowing effort to shield an imprudent strip search of a young girl behind a larger war against drugs. Contrary to Judge Hawkins's assertion, we are not "implicitly express[ing] disagreement" with the Safford Middle School's policy J-3050. Rather, we are following *T.L.O.*'s dictate to evaluate whether a search is "excessively intrusive in light of the . . . nature of the infraction." *T.L.O.*, 469 U.S. at 342. Nothing in the record provides any evidence that the school officials were concerned in this case about controlled substances violative of state or federal law. No legal decision cited to us or that we could find permitted a strip search to discover substances regularly available over the counter at any convenience store throughout the United States. *See, e.g.*, *Williams*, 936 F.2d at 882 (considering a strip search to discover either cocaine or a vial of "Rush"); *Cornfield*, 991 F.2d at 1323 (reviewing a strip search conducted to find marijuana or other controlled substances); *Phaneuf*, 448 F.3d at 593 (rejecting a strip search to uncover marijuana). And contrary to any suggestion that finding the ibuprofen was an urgent matter to avoid a parade of horribles, even if Savana had possessed the ibuprofen pills, any danger they posed was neutralized once school officials seized Savana and held her in the assistant principal's office. Savana had no means at that point to distribute the pills, and whatever immediately threatening activity the school may have perceived by the alleged possession of prescription-strength ibuprofen had been thwarted. The school officials had only to send Savana home for the

afternoon to prevent the rumored lunchtime distribution from taking place—assuming she in fact possessed the pills on her person. The lack of any immediate danger to students only further diminishes the initial minimal nature of the alleged infraction of bringing ibuprofen onto campus. As the Court pointed out in *T.L.O.*, a school is not a prison; the students are not inmates. *See* 469 U.S. at 338. We hasten to note, however, that if Savana had been accused of a federal crime, she would have been entitled to more legal protections that she received here. *See* 18 U.S.C. § 5033 ("Whenever a juvenile is taken into custody for an alleged act of juvenile delinquency, the arresting officer shall . . . immediately notify the Attorney General and the juvenile's parents, guardian, or custodian of such custody."); *United States v. C.M.*, 485 F.3d 492, 499 n.1 (9th Cir. 2007) (noting that "the officer must also advise the parents that they are permitted to speak with their child before the child is interrogated").

[12] As the Seventh Circuit reasoned in *Cornfield*, "a highly intrusive search in response to a minor infraction would . . . not comport with the sliding scale advocated by the Supreme Court in *T.L.O.*" 991 F.2d at 1320. Here, we have exactly such a scenario with the important additional variable that the subject of the search was a thirteen-year-old pubescent girl. Approving such a strip search would eviscerate the Supreme Court's stated goal of developing a standard that "ensure[s] that the interests of students will be invaded no more than is necessary to achieve the legitimate end of preserving order in the schools." *T.L.O.*, 469 U.S. at 343. We therefore conclude that the strip search was impermissible in scope. The Safford public school officials violated Savana's Fourth Amendment rights.

*B.   Was the Right of a Thirteen-Year-Old Girl to Be Free
      from Strip Searches on Suspicion of Possessing
      Ibuprofen Clearly Established in 2003?*

Having determined that the strip search violated Savana's
constitutional rights, we must consider whether those rights
were clearly established at the time of the search. *Saucier*, 533
U.S. at 200. That there is no case precisely on all fours does
not preclude the conclusion that the Fourth Amendment right
at issue was clearly established when the school officials
stripped and searched Savana. *See Drummond ex rel. Drum-
mond v. City of Anaheim*, 343 F.3d 1052, 1060-61 (9th Cir.
2003) ("[I]t is not necessary that the alleged acts have been
previously held unconstitutional, as long as the unlawfulness
was apparent in light of existing law."). We ask whether "it
would be clear to a reasonable officer that his conduct was
unlawful in the situation he confronted."[13] *Saucier*, 533 U.S.
at 202.

As of 1985, when the Supreme Court issued *T.L.O.*, the
legal framework was clearly established that would put school
officials on notice that a strip search was not a reasonable
measure to use on a thirteen-year-old girl accused by an unre-
liable student informant of having ibuprofen in violation of
school rules. In *T.L.O.*, the Supreme Court carefully
instructed school officials as to the twofold inquiry that must
be made before they engage even in a minimally intrusive
search: whether the search was justified at its inception and
whether it was reasonable in scope in light of the nature of the
infraction and the age and gender of the student. 469 U.S. at
341. The Safford authorities conducted their search almost

---

[13]There need not be judicial unanimity for us to conclude that a right
was clearly established to a reasonable officer. Indeed, majorities on the
Supreme Court and the various circuits have declared a right clearly estab-
lished over the dissents of their colleagues. *See, e.g.*, *Groh v. Ramirez*, 540
U.S. 551 (2004); *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted
Vill. Sch. Dist.*, 428 F.3d 223 (6th Cir. 2005); *Johnson v. Hawe*, 388 F.3d
676 (9th Cir. 2004).

twenty years after the Supreme Court's instructions issued in *T.L.O.* A reasonable school official, seeking to protect the students in his charge, does not subject a thirteen-year-old girl to a traumatic search to "protect" her from the danger of Advil. Indeed, the school officials' actions here were so patently in defiance of the considered approach *T.L.O.* dictates, that it is little wonder that we can find no case presenting identical facts.

Common sense and reason supplement the federal reporters. The *T.L.O.* Court expected no less of those to whom we entrust our children, leaving teachers to "regulate their conduct according to the dictates of reason and common sense." 469 U.S. at 343. Simply put: "It does not require a constitutional scholar to conclude that a nude search of a thirteen-year-old child is an invasion of constitutional rights of some magnitude. More than that: it is a violation of any known principle of human dignity." *Calabretta v. Floyd*, 189 F.3d 808, 819 (9th Cir. 1999) (quoting *Doe v. Renfrow*, 631 F.2d 91, 92-93 (7th Cir. 1980)).

**[13]** Earlier this year, the Sixth Circuit similarly recognized that some safeguards on government intrusion remain self-evident and do not require a case on point to prevent government officials from hiding behind the cloak of qualified immunity. In *Brannum v. Overton County School Board*, 516 F.3d 489 (6th Cir. 2008), middle school students brought suit against the school district for installing and operating video surveillance equipment in the boys' and girls' locker rooms at their school. The court's stirring prose reminds us that "[s]ome personal liberties are so fundamental to human dignity as to need no specific explication in our Constitution in order to ensure their protection against government invasion. Surreptitiously videotaping [middle school students] in various states of undress is plainly among them." *Id.* at 499. Rejecting a claim of qualified immunity, the court concluded that "a person of ordinary common sense, to say nothing of professional school administrators, would know without need

for special instruction from a federal court, that teenagers have an inherent personal dignity, a sense of decency and self-respect, and a sensitivity about their bodily privacy that are at the core of their personal liberty." *Id.* Even without a specific case on point, "[t]hese notions of personal privacy are 'clearly established' in that they inhere in all of us, particularly middle school teenagers, and are inherent in the privacy component of the Fourth Amendment's proscription against unreasonable searches." *Id.*

We adopt the reasoning of the Sixth Circuit.[14] Schoolchildren, as the Supreme Court recently reaffirmed, do not shed their constitutional rights at the schoolhouse gate. *Morse v. Frederick*, 127 S. Ct. 2618, 2622 (2007) (citing *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969)). This principle and the guidance provided by *T.L.O.* should have been clear to the school officials, who undertook the professional obligation to balance properly the order of the school with the individual liberties of the students who enter the school.

[14] We hold that Savana's rights were clearly established at the time that Assistant Principal Wilson, in his official capacity, initiated and directed the strip search. The record before us leaves no doubt that it would have been clear to a

---

[14]We wish to note the basis for our reliance upon *Brannum*. This decision did not put Safford school officials on notice as to the unconstitutionality of the search, not only because *Brannum* deals with a suspicionless video search of a locker room, but also because the Sixth Circuit reached its decision five years after the search of Savana. Rather, we rely upon the sound reasoning of *Brannum* that is equally applicable to a factually distinguishable search, such as the one currently before us. Like the Sixth Circuit, we conclude that a reasonable school official did not need direction in the form of a factually indistinguishable case resolved by a federal court to understand disrobing a thirteen-year-old girl to search for ibuprofen violated the student's constitutional rights anymore than it needed a case to know it should not videotape a middle school locker room. The "dictates of reason and common sense," and the two-step inquiry of *T.L.O.* should have sufficed. *See T.L.O.*, 469 U.S. at 343.

reasonable school official in Wilson's position that the strip search violated Savana's constitutional rights, and we therefore reverse summary judgment as to him and the school district. However, on the record before us, it is clear that the school nurse, Schwallier, and Wilson's assistant, Romero, acted solely pursuant to Wilson's instructions and not as independent decision-makers, and, thus, we affirm summary judgment as to them. *Cf. Ramirez v. Butte-Silver Bow County*, 298 F.3d 1022, 1028 (9th Cir. 2002) (noting that for subordinate police officers involved in a search "so long as they ma[k]e inquiry into the nature and scope of [the] warrant, reliance on their leaders' representations about it is reasonable").

### III.   CONCLUSION

The strip search of thirteen-year-old Savana did not satisfy either prong of *T.L.O.* and therefore was conducted in violation of Savana's Fourth Amendment rights. These constitutional principles were clearly established by the United States Supreme Court twenty years before the Safford school officials conducted the strip search of thirteen-year-old Savana. Therefore, we reverse the district court's determination that there was no violation of Savana's constitutional rights, conclude that the constitutional principles were clearly established as to Assistant Principal Wilson, affirm the grant of qualified immunity as to Schwallier and Romero, and remand for further proceedings consistent herewith.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

**Volume 2 of 2**

GOULD, Circuit Judge, with whom SILVERMAN, Circuit Judge, joins, dissenting:

Although I conclude that the Supreme Court's precedent in *New Jersey v. TLO*, 469 U.S. 325 (1985), and common sense show that the strip search of Savanna was unreasonable and unconstitutional, I dissent from the court's judgment because I conclude, contrary to the majority in Part II-B of its opinion, that the defendants are entitled to a qualified immunity from liability. I also conclude that constitutional rights were impaired under *TLO* by a slightly different analytical framework than that advanced by the majority.

In my view, it is most sound to ask, in the language of the first prong of *TLO*, whether any search of Savanna was justified in its inception, and then to ask, in the language of the second prong of *TLO*, whether the search was reasonable in scope under the total circumstances when it progressed to an invasive strip search requiring Savanna to shed all of her clothes except for undergarments in front of the school nurse and employee Helen Romero, and to shake her bra and underpants before the officials' eyes. *See TLO*, 469 U.S. at 346-47 (considering each element of the search step-by-step).

I would hold that some search of Savanna was justified at the inception because of concerns about illicit distribution of drugs at the school and the tip that she had supplied Marissa with prescription strength ibuprofen. To my thinking, to focus at the outset on the strip search poses the risk that we give inadequate heed to the real needs for some search of Savanna. I am confident that a reasonable school official should have proceeded to some search of Savanna in light of what Marissa had disclosed. Savanna does not contend otherwise; her complaint is only that the school officials went too far in requiring her to disrobe. Officials had been told by a person with an illicit drug that Savanna had supplied it, and that more distribution was to occur later that day involving others. This justified the school's request to search and its subsequent search

of Savanna's pockets and backpack, and may have warranted other search or inquiry activities to interdict any further distribution of ibuprofen at levels beyond what could be bought without prescription.

However, it was unreasonable to proceed to a strip search. Nothing in Marissa's tip suggested, or would have led one to believe, that Savanna had likely hidden ibuprofen in her underwear. She was observed from the first moment she was confronted, and certainly from that point would not likely have been able to hide any illicit drugs in her underpants or bra. More important is the fact, apparently unrecognized by the school officials, that to force a teenage girl to strip upon school command would lead to an embarrassment of her that could cause deep and lasting psychological harm. Without more concrete and specific justification, the scope of the search conducted in the nurse's office was excessively intrusive and an affront to what most parents would consider common sense treatment of their children at school. Thus I agree with my colleague Judge Wardlaw's conclusion that the strip search was unreasonable.

Finally, although I think our ruling should be crystal clear that schools may not subject a student to a strip search under circumstances as presented here, and although the general principles in *TLO* and other cases are well established, I can understand how school officials, even though they made an erroneous decision, should have some insulation from liability before our declaration of how these principles applied to this case. The fact that the district court and a majority of a prior panel of our court thought, and some dissenting judges on this panel continue to think, the scope of the search reasonable to me says something about a lack of clarity in our law. I am glad to agree with the majority opinion that the strip search was unreasonable in order to fix that. However, I conclude that the school officials are entitled to qualified immunity, and in this respect agree with the conclusion reached by my colleague Judge Hawkins in Section III of his opinion. In my

view, qualified immunity is available because the law heretofore did not give adequate guidance to the school officials.

---

HAWKINS, Circuit Judge, joined by Chief Judge KOZINSKI and Judge BEA, dissenting:

In this case we confront a formidable Fourth Amendment task: weighing the privacy interests of a thirteen-year-old girl against the interest of school officials in maintaining a safe and orderly school environment, which was threatened by, among other things, the discovery of unapproved prescription-strength ibuprofen on school grounds and the recent memory of a prescription-drug incident in which a student nearly died. The majority's Opinion holds that the officials' search[1] was unreasonable—both because it was unjustified at its inception and unreasonable in scope—and that the right to be free from such a search was clearly established at that time. I respectfully disagree on both issues.

In *New Jersey v. T.L.O.*, the Supreme Court held that a "reasonableness" standard governs school official searches, "spar[ing] teachers and school administrators the necessity of schooling themselves in the niceties of probable cause and permit[ting] them to regulate their conduct according to the dictates of reason and common sense." 469 U.S. 325, 343 (1985). Given that sound minds often differ on the dictates of reason, my disagreement with the majority likely boils down

---

[1] The majority favors the term "strip search" to describe a search that took place in a closed office with only a female school nurse and female administrator present, and began with Redding removing her jacket, shoes, socks, pants and shirt, and continued with her pulling her bra and shaking it, partially exposing her breasts, and pulling her underwear away from her body and shaking it, partially exposing her pelvic area. I would reserve the term "strip search" for a search that required its subject to fully disrobe in view of officials, and I think it is useful to maintain the distinction so that we can distinguish such searches from the one in this case.

to the weight to be assigned to the parties' respective interests and the degree of imbalance required to find a constitutional violation.

That said, I do have specific points of disagreement. In contrast to the Supreme Court's recent school search cases, the majority fails to acknowledge the unique considerations present in the public school setting, including the need for informal and flexible disciplinary measures, and the considerable risk presented by drugs. The Opinion also yields two rules that sweep too broadly: (1) that an uncorroborated tip from a student facing punishment is insufficient to justify the search at issue; and (2) that the search was per se unreasonable because officials were only seeking prescription-strength ibuprofen.

Finally, even if one were to accept the majority analysis, it appears abundantly clear that a reasonable school official did not, indeed could not, have had fair notice that the search violated Savana Redding's rights. *See Saucier v. Katz*, 533 U.S. 194, 202 (2001).

For these and the following reasons, I respectfully dissent.

## I.   The Flexibility of Cause in the School Setting

In *T.L.O.*, the Court recognized that an exceptional rule was required for a singular context and held that "the school setting requires some easing of the restrictions to which searches by public authorities are ordinarily subject." 469 U.S. at 340. The majority accurately recites the reasonableness inquiry, but fails in my view to acknowledge the impetus behind the novel standard: the need for school officials to act flexibly and swiftly in their efforts to maintain orderly and safe educational environments. Because this concern ought to guide a student search analysis, a review of the *T.L.O.* Court's reasoning will enhance the ultimate inquiry.

In crafting a reasonableness standard for student searches, the *T.L.O.* Court did not simply extend the extant Fourth Amendment jurisprudence governing law enforcement searches. Instead, it recognized that "what is reasonable depends on the context within which a search takes place," which requires " 'balancing the need to search against the invasion which the search entails.' " *T.L.O.*, 469 U.S. at 337 (quoting *Camara v. Municipal Court*, 387 U.S. 523, 536-37 (1967)).

The Court rejected the argument that children lack any legitimate expectations of privacy on campus, *T.L.O.*, 469 U.S. at 338–39, but explained that "[a]gainst the child's interest in privacy must be set the substantial interest of teachers and administrators in maintaining discipline in the classroom and on school grounds," *id.* at 339. Although the Court took note of the recent rise in drug use and violent crime, it made clear that "[e]ven in schools that have been spared the most severe disciplinary problems, the preservation of order and a proper educational environment requires close supervision of schoolchildren, as well as the enforcement of rules against conduct that would be perfectly permissible if undertaken by an adult." *Id.*

Of course, the preservation of order is an important goal outside of schools, but the school environment presents unique challenges. "Events calling for discipline are frequent occurrences and sometimes require immediate, effective action," and, therefore, "maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures." *Id.* at 339–40 (internal quotation marks omitted). Accordingly, the Court set out to craft a standard that would "preserv[e] the informality of the student-teacher relationship." *Id.*

Based on this reasoning, *T.L.O.* held that the general Fourth Amendment warrant requirement is ill-suited for school searches, for it would "unduly interfere with the maintenance

of the swift and informal disciplinary procedures needed in the schools." 469 U.S. at 340. The Court did not stop there, however. Over a spirited dissent, *id.* at 353–70 (Brennan, J., dissenting), the Court concluded that "the accommodation of the privacy interests of schoolchildren with the substantial need of teachers and administrators for freedom to maintain order in the schools does not require strict adherence to the requirement that searches be based on probable cause," *id.* at 341 (majority opinion). The Court believed that "the reasonableness standard should ensure that the interests of students will be invaded no more than is necessary to achieve the legitimate end of preserving order in the schools." *Id.* at 343.

The newly-minted reasonableness standard was to govern all school searches, even those that resulted from students' infractions of seemingly trivial rules.

> We are unwilling to adopt a standard under which the legality of a search is dependent upon a judge's evaluation of the relative importance of various school rules. The maintenance of discipline in the schools requires not only that students be restrained from assaulting one another, abusing drugs and alcohol, and committing other crimes, but also that students conform themselves to the standards of conduct prescribed by school authorities. . . . Absent any suggestion that the [rule forbidding specified conduct] violates some substantive constitutional guarantee, the courts should, as a general matter, defer to that judgment and refrain from attempting to distinguish between rules that are important to the preservation of order in the schools and rules that are not.

*Id.* at 342 n.9.

This review of the Court's thinking should inform our understanding of the reasonableness standard. The normal

Fourth Amendment balancing has been tipped to be more favorable to school officials; children maintain their right to a legitimate expectation of privacy, but school officials do not need probable cause to invade that right. This recalibration of the Fourth Amendment scales has a purpose: allowing school officials to respond swiftly and informally to effect their "substantial interest" in maintaining order in schools, including schools with no significant history of disciplinary problems. Further, the standard implicitly recognizes that school officials deserve deference to their policy judgments, as courts are expressly forbidden from deciding which school rules are too trivial to trigger searches under the reasonableness standard.

In light of this, it is important that our school search decisions have a forward-looking element. We must keep an eye on the consequences of our rulings so that we do not inadvertently formalize a setting that the Supreme Court has insisted remain informal. Similarly, we must manage the ever-present risk of impeding school officials' ability to respond quickly to disciplinary infractions, even if we think such infractions relatively benign. "A teacher's focus is, and should be, on teaching and helping students, rather than on developing evidence against a particular troublemaker." *T.L.O.*, 469 U.S. at 353 (Blackmun, J., concurring in the judgment).

This is not to say that we must rubber stamp every school search. While "unblinking deference," Majority at 8434, is certainly not called for, we should recognize that our normal, healthy skepticism of government authority must be reconciled with the realities of the school environment. "[T]eachers have a degree of familiarity with, and authority over, their students that is unparalleled except perhaps in the relationship between parent and child." *T.L.O.*, 469 U.S. at 348 (Powell, J., joined by O'Connor, J., concurring). Whereas "[l]aw enforcement officers function as adversaries of criminal suspects," "[r]arely does this type of adversarial relationship exist between school authorities and pupils. . . . The attitude

of the typical teacher is one of personal responsibility for the student's welfare as well as for his education." *Id.* at 349–50.

*T.L.O.'s* emphasis on these aspects of the school environment has been reaffirmed in subsequent cases. In *Vernonia School District 47J v. Acton*, the Court rejected a Fourth Amendment challenge to a school district's policy of conducting random urinalysis drug testing on student athletes, which required those students to urinate under teacher supervision. 515 U.S. 646, 648, 650, 664–65 (1995). In doing so, it noted that *T.L.O.* emphasized that "the State's power over schoolchildren" is "custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults." *Id.* at 655. In *Acton*, the school's role as a "guardian and tutor" was the "most significant element" in the Court's decision. *Id.* at 665.

Considering the government's interest in "[d]eterring drug use by our Nation's schoolchildren," the Court opined that "the nature of the concern is important—indeed, perhaps compelling—[which] can hardly be doubted." *Id.* at 661. Students are the most susceptible to the physical, psychological, and addictive effects of drugs, *id.*, and "of course the effects of a drug-infested school are visited not just upon the users, but upon the entire student body and faculty, as the educational process is disrupted," *id.* at 662.

Acknowledging that there was a less intrusive means of deterring drug abuse—" 'drug testing on suspicion of drug use' "—*Acton* reiterated that there is no "least intrusive" requirement under the Fourth Amendment. *Id.* at 663. The suspicion-of-drug-use requirement was undesirable because it would "add[ ] to the ever-expanding diversionary duties of schoolteachers the new function of spotting and bringing to account drug abuse, a task for which they are ill prepared, and which is not readily compatible with their vocation." *Id.* at 664.

More recently, the Supreme Court upheld a similar urinalysis drug testing policy that applied not only to student athletes, but also to all students who participated in competitive extracurricular activities. *Bd. of Educ. of Indep. Sch. Dist. No. 92 v. Earls*, 536 U.S. 822, 825 (2002). The Court explained that "[a] student's privacy interest is limited in a public school environment where the State is responsible for maintaining discipline, health, and safety," and cited as examples policies that require students to routinely "submit to physical examinations and vaccinations against disease." *Id.* at 830–31.

Reiterating the problems of adolescent drug abuse in schools discussed in *Acton*, the *Earls* Court stated that "the nationwide drug epidemic makes the war against drugs a pressing concern in every school." *Id.* at 834; *see also id.* at 835 ("[T]his Court has not required a particularized or pervasive drug problem before allowing the government to conduct suspicionless drug testing."). And, once again, the Court rejected the argument that the Constitution requires individualized suspicion before testing. *Id.* at 837. In addition to the reasons discussed in *Acton*, the Court offered an additional concern: "The fear of lawsuits resulting from such targeted searches may chill enforcement of the program, rendering it ineffective in combating drug use." *Id.*

Finally, just one year ago, the Supreme Court held that schools can "restrict student expression that they reasonably regard as promoting illegal drug use." *Morse v. Frederick*, 127 S. Ct. 2618, 2629 (2007). Drawing on the three Fourth Amendment school search cases, it restated that " 'the nature of [schoolchildren's] rights is what is appropriate for children in school,' " and that "deterring drug use by schoolchildren is an 'important—indeed, perhaps compelling' interest." *Id.* at 2627, 2628 (quoting *Acton*, 515 U.S. at 656, 661).

Twenty-three years after it was decided, *T.L.O.* remains good law. Students still have reduced expectations of privacy on campus, and school officials are still entitled to promptly

and informally confront threats to school order. Not only has the Court failed to strike down any searches under *T.L.O.*, it has gone even further, holding that schools can require students to provide urine samples under teacher supervision without any suspicion of drug use, and without any history of drug problems at the school. It is against this background that we must evaluate this search.

## II.   The Constitutionality of the Search

### A.   Inception

For a *T.L.O.* search[2] to be reasonable, it must be justified at its inception and reasonable in its scope. *T.L.O.*, 469 U.S. at 341. Generally, such a search will be " 'justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." *Id.* at 342.

Following the lead of the Second and Seventh Circuits, the majority holds that the level of suspicion required for a search to be justified at its inception varies with the intrusiveness of the search. Majority at 8436–37 (citing *Phaneuf v. Fraikin*, 448 F.3d 591, 596 (2d Cir. 2006); *Cornfield ex rel. Lewis v.*

---

[2]Hereafter, this dissent refers to a public school official's search of a student that is based on individualized suspicion as a "*T.L.O.* search." Such a search can be distinguished from an "*Acton* search" in which school officials conduct a systematic search without any individualized suspicion, and for which courts (should) use a different balancing test. *See Acton*, 515 U.S. at 653 (distinguishing *T.L.O.* because the search approved in that case, "while not based on probable cause, *was* based on individualized *suspicion* of wrongdoing"); *see also Thomas ex rel. Thomas v. Roberts*, 261 F.3d 1160, 1166–68 (11th Cir. 2001) (explaining the distinction between the two types of searches), *vacated*, 536 U.S. 953 (2002), *reinstated*, 323 F.3d 950, 952 (11th Cir. 2003). *But see Brannum v. Overton County Sch. Bd.*, 516 F.3d 489, 495 (6th Cir. 2008) (conflating the two types of searches and applying the *T.L.O.* two-step test to evaluate suspicionless use of video surveillance in school locker rooms).

*Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1321 (7th Cir. 1993)). This holding finds no support in the text or reasoning of *T.L.O.*, and it is by no means certain that the Supreme Court would approve.[3] *Cf.* 5 Wayne R. Lafave, Search and Seizure § 10.11, at 501 (4th ed. 2004) (noting with regret that "the reasonable suspicion test of [*T.L.O.*] is nowhere confined to searches of only limited intrusiveness").

I see the searches in *T.L.O.* somewhat differently than the majority. That case did not define those two searches by their level of intrusiveness; the searches were discrete because objects from unrelated infractions were sought. Had the Court employed the majority's standard, it might have said that the case involved a first search—opening and peering into the

---

[3]It may be simpler to analyze the intrusiveness of the search under the "scope" prong of the *T.L.O.* inquiry. This would allow the two *T.L.O.* prongs to be meaningfully distinct. The "justified at its inception" prong would inquire whether, based on all the circumstances, officials have a reasonable suspicion "that *the particular individual* being [searched] is engaged in wrongdoing." *United States v. Cortez*, 449 U.S. 411, 418 (1981) (emphasis added); *see also* Gould Dissent at 8454. The "reasonable in scope" prong, by contrast, would focus on the nature and intrusiveness of the search, including the locations (such as underwear) that officials searched for evidence. *See United States v. Sharpe*, 470 U.S. 675, 682–83, 686 (1985) (holding that law enforcement officers' decision to pull over specific vehicles on suspicion of drug trafficking was clearly justified at its inception based on those vehicles' characteristics and driving patterns; analyzing whether investigative stop was "too long in duration" under the reasonably-related-in-scope prong).

For example, a tip that "Redding is hiding stolen cash" would justify at its inception a decision to conduct some form of search of Redding because it created a reasonable suspicion that she, as opposed to someone else, was engaging in prohibited conduct. That tip alone, however, might be insufficient to permit a particularly intrusive search. By contrast, a tip that "some student hid stolen cash in her bra" would not justify at its inception a search of Redding because it gave no indication that *she* was hiding cash in her bra. Once officials gathered additional information that indicated Redding was the one with the cash, then a search of the bra would likely be reasonable in scope because of the specific information in the tip.

purse—providing suspicion that gave rise to the second search —rummaging through the purse. Instead, the Court explained that the case "involved two separate searches, with the first— the search for cigarettes—providing the suspicion that gave rise to the second—the search for marihuana." *T.L.O.*, 469 U.S. at 343–44.

Looking at the facts of *T.L.O.*, it is not difficult to determine why the Court identified the two searches in this way. When T.L.O. was first presented to the assistant vice principal, she was suspected only of violating the school's cigarette smoking policy. *T.L.O.*, 469 U.S. at 328. Once those cigarettes were found, it would have been unreasonable to continue searching T.L.O.'s purse for evidence of other wrongdoing, absent some newly discovered grounds for suspicion. This would be true even if the further search was *less* intrusive.[4] It was therefore sensible to identify the initial search for cigarettes as a single, limited search. Because rolling papers were found during the cigarette search, though, the assistant vice principal had reasonable suspicion justifying a second search—whether more or less intrusive.

Further, nothing in *T.L.O.* suggests that the assistant vice principal would not have been able to rummage through T.L.O.'s purse looking for cigarettes if they had not happened to be in sight when the purse was opened. Indeed, it is difficult to understand how the search for marijuana in the main compartment of the purse was meaningfully more intrusive than the search for cigarettes.[5]

---

[4]*See infra* note 17 and accompanying text.

[5]When, in the midst of looking for evidence of marijuana trafficking, the assistant vice principal read some letters he found in T.L.O.'s purse, he arguably conducted a more intrusive search than when he merely opened and looked into the purse for cigarettes. The Court's opinion indicates, though, that it was the further search of the purse—and not the reading of the letters—that marked the beginning of the second search. *See T.L.O.*, 469 U.S. at 347 ("The discovery of the rolling papers concededly gave rise to a reasonable suspicion that T. L. O. was carrying marihuana as well as cigarettes in her purse. This suspicion justified further exploration of T.L.O.'s purse . . . .").

A final point on *T.L.O.*: If the majority is correct, then the Supreme Court erroneously stated that there were only two searches. After all, if opening and looking into a purse is one search, and looking further into the purse is a second, then surely the search of a separate zippered purse compartment would have been a third, and the reading of letters discovered therein would have a been a fourth. *See T.L.O.*, 469 U.S. at 347.

Although the Supreme Court expressly considered the argument that the school official unreasonably read those letters, it did not identify that act, which was the most intrusive, as a separate search.[6] *Id.* And we can fairly assume the reason it did not: Imagine how burdensome it would be for courts to conduct the two-step *T.L.O.* inquiry for every component of a search. If the majority faithfully applied its own standard, it would have separately analyzed each increasingly intrusive step in today's search—(1) opening Redding's backpack and peering inside, (2) subsequently rummaging in the backpack, (3) removing Redding's shoes and peering inside, (4) reaching into the shoes, and so on with respect to Redding's socks, pants, and shirt. So much for "spari[ing] teachers and school administrators the necessity of schooling themselves in the niceties of probable cause." *Id.* at 343. School officials may find themselves having to contend with a "reasonable suspicion" doctrine that is becoming more complex than the probable cause doctrine rejected by *T.L.O.*

---

[6]The Court did consider, though, whether "the scope of the search [for marijuana] . . . exceeded permissible bounds when [the official] seized and read" the letters. *T.L.O.*, 469 U.S. at 347. The Court held that all the other evidence of marijuana trafficking found in the purse "was substantial enough to justify [the official] in examining the letters." *Id.* By framing the issue as the "scope of the search," it seems fairly clear that the Court was deciding whether the search for marijuana was "permissible in its scope," and not whether the reading of the letters was "justified at its inception."

All that said, because the search appears justified at its inception even under the majority's standard, this dissent will assume that the majority is correct and that a heightened level of suspicion was required to justify this particular search of Redding.

Even under the majority's sliding scale approach, though, school officials would be able to proceed with searches on something less than probable cause, even for highly intrusive searches.[7] Reasonable suspicion has been defined as "a particularized and objective basis for suspecting the person stopped of criminal activity, and probable cause to search as existing where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Ornelas v.*

---

[7]The majority's sliding scale approach is much like Justice Stevens' preferred school search standard. In his *T.L.O.* dissent, Justice Stevens argued that school searches should only be permitted when there is reasonable suspicion that those searches would "uncover evidence that the student is violating the law or engaging in conduct that is seriously disruptive of school order, or the educational process." *T.L.O.*, 469 U.S. at 378 (Stevens, J., dissenting) (emphasis omitted). Whereas today's majority looks to the degree of the search's intrusiveness to determine how much suspicion is required, Justice Stevens would have "varie[d] the extent of the permissible intrusion with the gravity of the suspected offense." *Id.* at 379. Both standards would, in their own way, prohibit searches that " 'display[ ] a shocking lack of all sense of proportion.' " *Id.* at 380 (quoting *McDonald v. United States*, 335 U.S. 451, 459 (1948) (Jackson, J., concurring)).

The *T.L.O.* majority explicitly rejected Justice Stevens' standard because it would intrude too much upon school officials' "comprehensive authority . . . to prescribe and control conduct in the schools." 469 U.S. at 342 n.9 (internal quotation marks omitted). The Court's insistence on a reasonable suspicion standard for searches that follow the most trivial infractions does not necessarily mean that the Court would reject a probable cause standard for the most intrusive searches. But I do think that our adoption of a probable cause standard for highly intrusive searches would violate the tenor of *T.L.O.* and create significant tension with that authority, and we should, therefore, prudently abjure such a rule absent a contrary indication from the Supreme Court.

*United States*, 517 U.S. 690, 696 (1996) (internal quotation marks and citations omitted).

Because these are "fluid concepts," and not "finely-tuned standards" that are "readily, or even usefully, reduced to a neat set of legal rules," *Ornelas*, 517 U.S. at 695–96 (internal quotation marks omitted), attempting to distinguish between a high level of reasonable suspicion and probable cause may be something of a fool's errand. Nevertheless, we must not demand that school officials present too much independently corroborated evidence from unquestionably reliable sources; we must ensure that even highly intrusive searches do not stand or fall on the presence of probable cause.[8]

Under the reasonable suspicion standard, our goal is to ensure that Kerry Wilson, Helen Romero, and Peggy Schwallier (collectively, the Safford Officials) were not acting on the basis of "an inchoate and unparticularized suspicion or hunch," but rather on "the sort of common-sense conclusio[n] about human behavior upon which practical people—including government officials—are entitled to rely." *T.L.O.*, 469 U.S. at 346 (internal quotation marks omitted; alteration in original).

Based on the record evidence, the Safford Officials possessed sufficient information to reasonably suspect Redding of possessing prescription-strength ibuprofen.

Although Redding had no disciplinary record, there was reason to suspect that she had violated Arizona's law regarding possession and consumption of spiritous liquor by a per-

---

[8]*See T.L.O.*, 469 U.S. at 353 (Blackmun, J., concurring in the judgment) (explaining that school officials' ability to respond swiftly would not "be possible if a teacher could not conduct a necessary search until the teacher thought there was probable cause for the search. A teacher has neither the training nor the day-to-day experience in the complexities of probable cause that a law enforcement officer possesses, and is ill-equipped to make a quick judgment about the existence of probable cause").

son under the legal drinking age just a few months before the October search. *See* Ariz. Rev. Stat. Ann. § 4-101(18) (" 'Legal drinking age' means twenty-one years of age or older."); *id.* § 4-244(9) (providing that it is unlawful "for a person under the legal drinking age to buy, receive, have in the person's possession or consume spiritous liquor").

At the August school dance, "several staff members noticed some unusually rowdy behavior from a small group of students, including Marissa . . . and Savana Redding," and a bottle of alcohol and a pack of cigarettes were found in the girls' bathroom. The majority points out that the staff found no specific link between Redding and the bottle, Majority at 8427, but there is undisputed testimony that the staff detected the smell of alcohol among Redding's small group.

A week before Redding's search, Principal Robert Beeman and Assistant Principal Wilson sat down to meet with Jordan and his mother at her request. Jordan's mother reported that he had become violent with her and sick to his stomach a few nights earlier, and Jordan explained that this occurred after he ingested some pills that he received from a classmate. He also advised the administrators that students were bringing weapons and drugs onto school grounds.

As the meeting progressed, Jordan provided Beeman (Wilson had left the meeting) with "very detailed accounts regarding several students' activities," including Marissa and Redding. Jordan reported that Redding had hosted a party in her camper trailer before the August dance, and that she had served alcohol—"Jack Daniel's, Black Velvet, vodka, and tequila"—that her mother had purchased. After the meeting, Beeman relayed the information to Wilson.

We can pause at this point and review the evidentiary picture from the perspective of a reasonable school official. The eighth graders' school year began inauspiciously when staff noticed signs of illegal alcohol consumption at the school

dance. With Jordan's report, the situation was ripening into something much more dangerous—the presence of drugs and weapons on campus. The description of Jordan's reaction to his pill ingestion would have recalled to a reasonable school official's mind an incident several years before in which a Safford Middle School student brought prescription pills to school and distributed them. In that incident, a student who took that drug had to be airlifted to an intensive care unit and almost died.

While Redding's role in all this was somewhat unclear at this point, certainly Jordan's account of the pre-dance party, coupled with the staff's report from that dance, supported a reasonable suspicion that Redding had been illegally serving and consuming alcohol less than a month and a half earlier. Further, the staff's report suggested that Redding and Marissa were, to some extent, partners in this mischief.[9] Although we accept as true Redding's testimony that she did not serve or consume alcohol that night and that Jordan did not attend her party, there is no evidence that this was ever communicated to any official at Safford Middle School. To justify a reasonable suspicion, the officers' factual determinations were not required to be correct, but only reasonable given the facts known to them. *See Phaneuf v. Fraikin*, 448 F.3d 591, 597 (2d Cir. 2006); *United States v. Hartz*, 458 F.3d 1011, 1017–18 (9th Cir. 2006); *United States v. Hatley*, 15 F.3d 856, 859 (9th Cir. 1994).

---

[9]When Beeman followed up with Redding's mother, she "simply dismissed the account by saying that Savana would not have been involved." The majority seems to give full credit to this statement. Majority at 8441. Based on Beeman's affidavit, one can infer that Redding's mother lacked personal knowledge of the party, given that she said that Redding "would not have been involved," instead of "was not involved." In light of this, one might question whether her denial should have carried much weight with the school officials in light of the mutually reinforcing observations of disinterested witnesses.

One week after the meeting with Jordan and his mother, Wilson was confronted with hard evidence that drugs were indeed on campus. On the morning of October 8, Jordan went to see Wilson and handed him a pill that he had just received from Marissa. According to Jordan, there were additional pills in the school that some students were planning on taking at lunch.[10] Wilson consulted with Schwallier, the school nurse, who told him that the pill was Ibuprofen 400 mg, which could be obtained only with a prescription.

Wilson called Marissa out of class and asked her to accompany him. As Marissa stood up, Wilson noticed a planner in the desk next to her and asked the classroom teacher to determine its owner. The teacher discovered several knives and lighters, a cigarette, and a permanent marker inside the planner, and shared this information with Wilson.

Arriving at his office with Marissa and the planner, Wilson asked Romero, an administrative assistant, to observe as Marissa turned out her pockets and opened her wallet. Marissa complied, producing a blue pill (later discovered to be Naprosyn 200 mg), several pills identical to the one Jordan had possessed, and a razor blade.

According to Wilson's affidavit, the following exchange took place: "[Wilson] asked Marissa where the blue pill came from. Marissa responded, 'I guess it slipped in when *she* gave me the IBU 400s.' [Wilson] asked 'who is *she*?' Marissa responded 'Savana Redding.' "

Wilson asked Marissa about the planner, and she denied

---

[10]The majority points out that "the information provided by Jordan link-[ed] Marissa alone to the ibuprofen." Majority at 8441. This is correct in that Jordan only specifically identified Marissa. To be clear, though, Jordan told Wilson that other students were planning on taking pills, so Wilson could have reasonably believed that students other than Marissa were in possession of pills.

any knowledge of it and its contents. A subsequent search of Marissa conducted by Nurse Schwallier and Romero failed to produce any more pills.

At this point, one can conclude that Wilson had sufficient evidence to support a reasonable suspicion that Redding had prescription-strength ibuprofen, Naprosyn, and possibly other drugs.[11] Marissa expressly identified Redding as the supplier, and there was nothing to suggest that this was not true.

The majority views Marissa's statement with extraordinary skepticism. We are told that Marissa, a "frightened" girl, Majority at 8439, was "attempt[ing] to shift the school officials' focus off herself," Majority at 8429, with a "self-serving," "self-exculpatory" explanation, Majority at 8439.

Wilson's affidavit is the only discussion in the record of Marissa's behavior during the meeting.[12] Notably absent from that discussion is any indication that Marissa was frightened. And the statement can hardly be characterized as exculpatory because it in no way reduced Marissa's guilt; regardless of whether she brought the pills from home or received them from Redding, Marissa was caught with them in her possession and was known to have distributed one to Jordan.

The only way the statement would be self-serving is if it somehow furthered Marissa's interests. There is no evidence that she had any ulterior motive for implicating Redding, or that she would face a reduced punishment for cooperating. If,

---

[11]Based on Marissa's statement, one could reasonably speculate whether Redding possessed pills other than Naprosyn and ibuprofen. This is because Marissa suggested that Redding had only intended to give her ibuprofen, and that the Naprosyn had inadvertently "slipped in." If Redding had possessed Naprosyn without intending to share it that morning with Marissa, it was an open question what other pills she may have had that were withheld from Marissa.

[12]Romero's affidavit also discusses Marissa's statement, but it is identical to the language in Wilson's affidavit.

for example, Marissa was facing a suspension for possession and distribution of the pills, there is no reason to believe that she would have escaped that punishment simply by naming her source. And even if Marissa did think she was helping herself out by blaming Redding, nothing put Wilson on notice that Marissa held such a belief.

Further, even if we should assume that Marissa would have believed that there would be a quid pro quo for naming her source, it is difficult to see why Wilson should have suspected Marissa was lying. If Marissa knew that Redding actually had no pills, she also would have known that a search would have turned up nothing. A fruitless search that wasted Wilson's time may have temporarily shifted the focus off of Marissa, but Marissa should not have thought that it would abate her inevitable punishment.

Of course, the situation could be different if there were evidence that Marissa had been induced or intimidated into naming Redding. Had Wilson pressured Marissa into supplying other students' names, one might wonder whether she had been making up a story simply to please him. Similarly, had Wilson suggested to Marissa that he suspected Redding—for example, "Honestly, Marissa, it was Savana who gave you the pills, wasn't it?"—one might think Marissa was simply telling Wilson what he wanted to hear. According to the undisputed testimony, however, none of these circumstances were present.

In spite of all the objections that the majority raises to Wilson's reasoning, his suspicion of Redding simply does not appear to be "the product of a volatile or inventive imagination," or a pretext for "an act of harassment." *Terry v. Ohio*, 392 U.S. 1, 28 (1968). Because it was reasonable to conclude that Redding brought pills to school that morning, "it is irrelevant that other hypotheses"—including the hypothesis that Marissa was lying—"were also consistent with [Marissa's] accusation." *T.L.O.*, 469 U.S. at 346.

Returning to the events, Wilson's immediate response to Marissa's tip was sensible. He told Redding to leave her classroom and to bring her books and backpack with her. They returned to his office, where Wilson asked Redding whether she knew anything about the planner and the pills sitting on his desk.

Redding admitted that the planner was hers and informed Wilson that she had lent the planner to Marissa a few days earlier. Like Marissa, however, she denied ownership of any of its contents. She also stated that she had never brought any prescription pills to school and that she had never distributed pills to other Safford students.

Wilson asked Redding if he could search her "stuff," and Redding consented. Romero was called in to assist, and a search of Redding's backpack turned up nothing.

Wilson now had to decide whether a further search of Redding was called for. Nothing in his exchange with Redding cast doubt on Marissa's story. Nor did Redding offer any reason why another student would falsely accuse her. The meeting, in other words, failed to produce any information that should have removed Wilson's reasonable suspicion.

Indeed, information uncovered at the meeting actually *increased* the likelihood that Redding had supplied Marissa with the pills. By conceding that she had lent Marissa the planner, Redding established a crucial link between the two girls, enabling Wilson to reasonably conclude that Redding and Marissa were friends.

The majority rejects this reasoning, asserting that Redding's lending of the planner "does not make it significantly more likely that Savana had anything to do with the pills carried in Marissa's pockets." Majority at 8441. This is the "crabbed notion of reasonableness" that the *T.L.O.* Court rejected. *T.L.O.*, 469 U.S. at 343.

> [I]t is universally recognized that evidence, to be relevant to an inquiry, need not conclusively prove the ultimate fact in issue, but only have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

*Id.* at 345 (quoting Fed. R. Evid. 401).

To be sure, the planner was only circumstantial evidence of Redding's pill distribution, for it did no more than establish that there was a relationship between Marissa and Redding. Wilson had reason to believe Marissa and Redding were friends from the reports of their behavior at the school dance, and the planner corroborated that. Although the planner was not direct evidence of pill possession, common sense suggests that it is significantly more likely an eighth grader will receive contraband from a classmate who has lent her personal items than from someone with whom she has hardly any relationship at all. This does not suggest that the planner independently justified the search, and it is certainly not "guilt-by-association." Majority at 8441. If anything, it is "guilt" (or, more accurately, suspicion) by direct accusation and circumstantial corroboration.

Redding's denial itself deserves little weight.[13] Everything the majority says to impugn Marissa applies with greater force to Redding, since her statement was truly exculpatory and wholly self-serving. *See, e.g.*, Majority at 8439-40 (viewing skeptically "the self-serving statement of a cornered teenager facing significant punishment").

The majority would credit Redding over Marissa in this

---

[13]Obviously, a confession by Redding would have conclusively established reasonable suspicion, so the absence of a confession is in that sense meaningful.

"she said, she said" contest because Marissa's "compounding number of school rule violations"—the objects concealed in the planner—should have left Wilson incredulous. Majority at 8441. Wilson, however, did not know that those objects belonged to Marissa, and not Redding. While both girls denied knowledge of the planner's contents, Redding admitted to owning the planner. Although it would be perfectly reasonable for Wilson to surmise that Marissa placed the contraband in the planner without Redding's knowledge, he could not be sure that Redding had not given Marissa the planner with those items in it.

Redding's discipline-free record is of limited probative value in light of the strong signs that she had recently been drinking liquor and serving it to her classmates. And, unless we think that the Fourth Amendment gives greater protection to good test takers, there is only so much weight we can give to Redding's honor-student status.

We are told that "Wilson should have conducted additional investigation to corroborate Marissa's 'tip' " before ordering an intrusive search—he could have had a discussion with Redding's teachers, her parents, and other students. Majority at 8440. Although these options may be desirable in other contexts, they disregard the special needs of the school environment that were articulated in *T.L.O.*

Pulling teachers and students out of class to question them about Redding's behavior would be extraordinarily disruptive to the educational environment. *See T.L.O.*, 469 U.S. at 353 (Blackmun, J., concurring in the judgment) ("The time required for a teacher to ask the questions or make the observations that are necessary to turn reasonable grounds into probable cause is time during which the teacher, and other students, are diverted from the essential task of education."). If Wilson had information that suggested specific students or teachers had knowledge relating to Marissa and Redding, then it may have been prudent to question those individuals. But

without any specific leads, it would seem incredibly burdensome to require that Wilson conduct a full-scale investigation, speaking to every student and teacher, simply to corroborate Marissa's tip.[14] *Cf. Earls*, 536 U.S. at 837 (noting that a regime of individualized suspicion "place[s] an additional burden on public school teachers who are already tasked with the difficult job of maintaining order and discipline").

Moreover, these hypothetical investigations appear designed to amass enough evidence to supply Wilson with probable cause. If Wilson had lacked a specific tip from Marissa, then it would have been necessary for him to marshal a good deal of circumstantial evidence to justify the search of Redding. As it stands, though, it is hard to imagine what sort of additional evidence Wilson could have received that would supply him with a level of reasonable suspicion that was less than probable cause.

Both the majority and this dissent discuss at length whether this search was justified at its inception. It is certainly a scenario about which entirely reasonable minds can differ. In scrutinizing this particular search, though, we should not lose sight of an important point: Today's justified-at-its-inception holding is not limited to searches for ibuprofen. Had Marissa been caught with uncut cocaine or bullets for a small-caliber

---

[14]Discussions with Redding's parents certainly would have shown a level of respect for them and Redding, and their presence would have likely alleviated some of the stress and anxiety that Redding may have been feeling. For those reasons, we can encourage school officials to show compassion by involving parents in the searching and questioning of students. As a means of furthering the Redding investigation, though, discussions with Redding's parents would have likely provided little useful information. Had Redding admitted to having the pills, but insisted that she had a legitimate reason for bringing them on campus (and handing them to Marissa), her parents may have been able to corroborate her story. But Redding insisted that she brought no pills to school, and unless her parents had searched her and her belongings that morning, it is difficult to envision what information they could offer to negate Wilson's reasonable suspicion.

handgun, the analysis would necessarily be the same. Although the "nature of the infraction" is relevant to the overall reasonableness inquiry, *T.L.O.* makes clear that the infraction is relevant only to the "scope" analysis; it has no bearing on the quantum of suspicion necessary to justify a search. *T.L.O.*, 469 U.S. at 341–42 & n.9. And, in today's educational environment, students do bring guns and drugs into their classrooms.

## B.   Scope

A search that is justified at its inception will nevertheless be unreasonable if it is not "reasonably related in scope to the circumstances which justified the interference in the first place." *T.L.O.*, 469 U.S. at 341. A search "will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *T.L.O.*, 469 U.S. at 342.

We have reached the heart of this case. Having considered Redding's age, the relative harmlessness of ibuprofen, the trauma of this search, and the lack of particularized suspicion that pills would be found in Redding's underwear, the majority determines that the school officials "adopted a disproportionately extreme measure" that was impermissible in scope. Majority at 8443-44.

The majority lays out an eminently reasonable argument to support this conclusion. Nevertheless, because I weigh the factors differently and accord the school officials' judgment greater deference, I would find the search reasonable in scope.

Given that the precise contours of this "scope" analysis are undefined,[15] school officials and lower courts could greatly benefit from the development of clear guidelines. The follow-

---

[15]*See supra* note 3; *infra* Part III.

ing three-step inquiry and some general rules might be helpful in that regard.

First, courts should determine whether "the measures adopted are reasonably related to the objectives of the search." *T.L.O.*, 469 U.S. at 342. This straightforward inquiry considers the search's probability of success, examining the nature of the evidence sought and any facts that make it more or less likely such evidence will be found in a specific location.[16]

For example, if a student were rumored to have brought a baseball bat on campus in violation of school policy, a search of that student's shirt pocket would be patently unjustified. Or if a student reports that she just saw drugs in a classmate's locker, and the classmate has had no opportunity to remove those drugs, a search of any place other than the locker may be unreasonable. The same can be said if a specific item is sought—say, a stolen necklace—and a search of the suspect's shoes uncovers the necklace; it would probably be unreasonable to continue searching the suspect or his belongings for additional contraband.[17]

The next two steps of the "scope" inquiry consider whether a search that has some probability of success is unreasonable because it is "excessively intrusive." *T.L.O.*, 469 U.S. at 342.

In the second step, we examine the characteristics of the search. Our goal is to measure its intrusiveness in light of the attributes of the suspected student.

---

[16]Where, as the majority does here, a court considers whether a specific *type* of search is justified at its inception (e.g., visual body search, purse search), this analysis is probably redundant.

[17]Alternatively, one might say that a continued search is no longer justified at its inception unless additional evidence of some separate infraction were found in the midst of the initial search. *See T.L.O.*, 469 U.S. at 347; *see supra* note 4 and accompanying text.

*T.L.O.* provides two specific attributes to consider: age and sex. *T.L.O.*, 469 U.S. at 342. In *Acton*, the Court went further and approved random urinalysis of student athletes because, in part, "[s]chool sports are not for the bashful" and "there is an element of communal undress inherent in athletic participation." *Acton*, 515 U.S. at 657 (internal quotation marks omitted). There is no reason to limit the factors to age, sex, and extracurricular activities.

Mental disability, for instance, is relevant to determining whether a child can give effective consent. It may be more unreasonable to pat down or strip search a child who had been physically or sexually abused than a child without such history. And if school officials know that a student has a particularly acrimonious or emotionally fraught relationship with a specific teacher, "reasonableness" may counsel that the teacher be prohibited from conducting intrusive searches whenever possible.

The final factor to be considered is the "nature of the infraction." *T.L.O.*, 469 U.S. at 342. This is by far the thorniest part of the analysis, for *T.L.O.* has given us conflicting directions.

The Court expressly stated that the "nature of the infraction" is part of the "scope" analysis. *Id.* at 342. It also emphatically rejected Justice Stevens' "suggestion that some rules regarding student conduct are by nature too 'trivial' to justify a search based upon reasonable suspicion." *Id.* at 342 n.9. These two propositions are easily compatible if the nature of the infraction is irrelevant to whether a search was justified at its inception, but properly considered in determining whether the search was permissible in scope. *Cf. supra* note 3. Indeed, as a matter of black letter law, this appears to be the proper way to understand the *T.L.O.* doctrine.

In criticizing Justice Stevens' views, though, the Court used language that suggests that deference to school officials' judg-

ment pervades the entire reasonableness analysis. The Court was "unwilling to adopt a standard under which the legality of a search is dependent upon a judge's evaluation of the relative importance of various school rules." *T.L.O.*, 469 U.S. at 342 n.9. Instead, courts "should, as a general matter, defer to [school officials'] judgment and refrain from attempting to distinguish between rules that are important to the preservation of order in the schools and rules that are not." *Id.*

This passage complicates matters.[18] By evaluating the nature of the infraction, as we are told we must do, we will in many cases end up second-guessing school officials' judgment. To find a search excessively intrusive in light of a student's harmless behavior is to hold that teachers and administrators, notwithstanding their greater expertise and better familiarity with their particular school and students, overestimate the threat a given infraction posed to the educational environment.

Although this presents considerable analytical tension, we can manage the difficulty by adopting some general rules. First, no school rule is too trivial to allow for *some* form of search. Even the most harmless violations of school policy—chewing gum, wearing hats, passing notes—threaten the educational environment by virtue of the student engaging in prohibited activity. School officials have a strong interest in inculcating discipline and eliminating distractions from the classroom.[19] This interest would surely allow a teacher to

---

[18]*Cf. Jenkins ex rel. Hall v. Talladega City Bd. of Educ.*, 115 F.3d 821, 828 (11th Cir. 1997) (en banc) (granting qualified immunity to officials who conducted *T.L.O.* search because "[f]aced with a series of abstractions, on the one hand, and a declaration of seeming deference to the judgments of school officials, on the other, it is difficult to discern how *T.L.O.* could be interpreted to compel the conclusion that these defendants . . . should have known that their conduct violated a clearly established constitutional right").

[19]As Justice Blackmun charmingly stated, "Every adult remembers from his own schooldays the havoc a water pistol or peashooter can wreak until it is taken away." *T.L.O.*, 469 U.S. at 352 (Blackmun, J., concurring in the judgment).

order a student to disclose what she is concealing in her hand, or to require a student to stand up and reveal what is hidden on a chair. Such *mala prohibita*, however, will rarely justify significantly intrusive searches.

Second, school officials deserve the greatest latitude when responding to behavior that threatens the health and safety of students or teachers. We can distinguish, then, between a search for a stolen hat and a search for a stolen inhaler or stolen insulin. Similarly, when school officials reasonably believe that a student is carrying a weapon or harmful drugs, it will rarely be unreasonable for them to do what they can to neutralize the danger.

Third, as a corollary to the previous rule, courts should distinguish between two types of searches for harmful objects: those intended to uncover evidence of past wrongdoing, and those responding to an ongoing or future threat. A search for heroin-loaded syringes deserves the utmost deference, whereas a search for used and empty ones may, at some point of intrusiveness, be better left to parents or law enforcement.

Finally, we should resist using our independent judgment to determine what infractions are so harmful as to justify significantly intrusive searches. Seemingly innocuous items can, in the hands of creative adolescents, present serious threats. Courts may not immediately appreciate the wisdom of a school policy that bans, say, aerosol spray cans, but that is why judges are not chosen to run schools.[20]

Relatedly, if a school board wishes to prohibit students from bringing scissors to school for fear that they may be

---

[20]Although aerosol spray cans and bottles pose little threat to a responsible user, death can result "from a single session of inhalant use by an otherwise healthy young person." Nat'l Inst. on Drug Abuse, U.S. Dep't of Health & Human Servs., *Inhalants* 2 (June 2007), *available at* http://www.nida.nih.gov/PDF/Infofacts/~Inhalants07.pdf.

used as weapons, we should not require that the school board defend the policy by establishing that there is a history of scissor-stabbing at the school. Schools are entitled to stay one step ahead of tragedy. Likewise, if a teacher has reasonable suspicion that a student is violating the scissor policy, he should be entitled to assume, absent contrary evidence, that the student has the worst intentions. Ordinarily, the teacher-student relationship should be suffused with trust. But when a student presents a potential threat of harm to himself or others, we should not require school officials to be optimistically naive. Searches are often fruitless, and students' motives are often benign, but teachers, unlike courts, do not act with the benefit of hindsight.

Although a close call, this analytical framework leads to the conclusion that the search of Redding was permissible in scope.

The measures adopted in this case were reasonably related to finding ibuprofen. Assuming that the search was justified at its inception (as we must in the "scope" analysis), Wilson had reason to believe that Redding possessed small pills. There was no indication where those pills might be, however. A search of Redding's backpack turned up nothing, and she was wearing clothes without any pockets that day. There is no question that the pills could physically be concealed in Redding's underwear in a way that would avoid superficial observation.

Absent evidence that pills were not under Redding's clothes, it hardly seems irrational that they might be concealed in places that only a more intrusive search would uncover. *See Williams ex rel. Williams v. Ellington*, 936 F.2d 881, 887 (6th Cir. 1991) (upholding "strip search" that occurred after officials failed to find a small glass vial in student's locker and purse because at that point "it was reasonable . . . to suspect the girl may be concealing the contraband on her person").

As a doctrinal matter, we should distinguish searches that are unreasonable because of an insufficient probability of success from searches that are unreasonable because of excessive intrusiveness.[21] In Redding's case, I believe it is the intrusiveness of the search that should give us pause, but not Wilson's suspicion that pills might be hidden under clothes.

As for the second step of the inquiry—the intrusiveness of the search in light of the attributes of the student—I have no disagreement with the majority's thorough discussion of the impact of "strip searches" on young teenagers. Redding testified to being "embarrassed and scared" and on the verge of tears, and, undoubtedly, most children would have had the same reaction.

We must remember, however, that *T.L.O.* does not prohibit searches that achieve some absolute level of intrusiveness. Rather, the question is one of proportion, for searches are only unreasonable if they are "*excessively* intrusive." *T.L.O.*, 469 U.S. at 342 (emphasis added). No court should ignore the profound effect that a highly intrusive search has on a thirteen-year-old girl, but a conclusion about reasonableness can come only after we consider the impetus for the search.

We turn, then, to the "nature of the infraction." The majority holds that prescription-strength ibuprofen is simply too harmless to permit the search at issue. Majority at 8446. In doing so, it implicitly expresses disagreement with the Safford Middle School's District Policy that prohibits "[t]he non-medical use, possession or sale of . . . [a]ny prescription or

---

[21]This is not to say that an intrusive search cannot be more or less reasonable based on the level of information available to officials. Ordinarily I would consider this as a fourth step in the "scope" inquiry. *See supra* note 3. The majority, however, has decided that this is best analyzed under the justified-at-its-inception analysis by requiring greater suspicion for more intrusive searches. For the ease of responding, I have employed that same framework today.

over-the-counter drug, except those for which permission to use in school has been granted."

In my view, the outcome of the case depends on the deference we give to school officials' judgment. The school policy was not adopted solely to create an environment more conducive to learning; rather, it reflects the District's view that even over-the-counter drugs can be harmful when used for non-medical purposes. Given the school officials' greater expertise, we should credit their beliefs.

Admittedly, ibuprofen is one of the mildest drugs children could choose to abuse. But that does not mean it is never harmful.

According to the Physicians' Desk Reference entry for Motrin IB, children under the age of twelve should only use the drug as directed by a doctor.[22] Physician's Desk Reference 1882 (62d ed. 2008). Children who ingest 100 to 200 milligrams of ibuprofen per kilogram of body weight "may be managed with induced emesis," and children who ingest 200 to 400 mg/kg "should have immediate gastric emptying and at least four hours observation in a health care facility. Children ingesting greater than 400 mg/kg require immediate medical referral, careful observation and appropriate supportive therapy." *Id.* at 1883. Even adults can suffer "severe allergic reaction." *Id.* at 1882. When taken in combination with other nonsteroidal anti-inflammatory drugs (such as aspirin or naproxen), blood thinners, or steroid drugs, ibuprofen can cause stomach bleeding. *Id.*

This information supplies a rational basis for the school's policy, given officials' concern for the health of their students, including those who were planning to abuse the ibu-

---

[22]Redding was thirteen at the time of the search, but Wilson did not have to assume that she would have scrupulously distributed the pills based on her schoolmates' age, weight, and medical history.

profen. Once we rule out irrationality, we should categorize this search as one aimed at protecting the safety of children and grant the Safford Officials the appropriate latitude. Any greater parsing of their decision is inconsistent with the deference owed to school officials, and we should not create a rule that will cause teachers and administrators to hesitate when they in good faith believe children are at risk. While this court enjoys the luxury of studying ibuprofen's medical profile and debating its dangerousness, Wilson did not. *See Williams*, 936 F.2d at 886 ("To question an official's every decision with the benefit of hindsight would undermine the authority necessary to ensure the safety and order of our schools.").

Importantly, Wilson was not searching for evidence of past ibuprofen use, such as an empty Advil bottle. He was acting on specific information that children in school had pills and were planning on taking them later that day.

The majority would be content to have Redding sent "home for the afternoon to prevent the rumored lunchtime distribution from taking place." Majority at 8446-47. Or, the majority says, Redding could have been held, but not intrusively searched, in Wilson's office because she would have had no means to distribute the pills that afternoon. This demonstrates a misunderstanding of the temporal nature of the threat. The students were not planning to rob the 3:10 train to Yuma; they were going to pop pills. The danger would not be "neutralized" by holding Redding for the afternoon, Majority at 8446, it would simply be postponed until the students left school or until lunchtime the next day. Let us be realistic: Had Wilson *not* acted swiftly and decisively, and had a child fallen ill, the community would have been outraged by the school's laxity.

It may be that Wilson overestimated the risk to Redding and others. Indeed, I am sure there are other reasonable school officials who would have simply sent her back to class after an unsuccessful backpack search. Certainly, the Fourth Amendment did not require that Redding endure this particu-

lar search. But under these circumstances, I do not think it was unreasonable for school officials, acting in good faith, to conduct the search in an effort to obviate a potential threat to the health and safety of their students.

## III.   The Reasonableness of the Safford Officials' Actions

The prior discussion on the constitutional question foreordains the treatment of the qualified immunity issue. The "relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). Because the Safford Officials' "mistake as to what the law requires [was] reasonable," they all are entitled to qualified immunity. *Id.* at 205.

To its credit, the majority frames Redding's Fourth Amendment right with a degree of particularity that allows for a meaningful clearly-established analysis. *See Anderson v. Creighton*, 483 U.S. 635, 639–40 (1987). The issue is whether, under *T.L.O.*, "the right of a thirteen-year-old girl to be free from strip searches on suspicion of possessing ibuprofen [was] clearly established in 2003." Majority at 8448. In answering this question, we must be mindful that "[q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.' " *Lee v. Gregory*, 363 F.3d 931, 934 (9th Cir. 2004) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

We begin our examination by looking at the case law that existed at the time the Safford Officials authorized the search. *Inouye v. Kemna*, 504 F.3d 705, 712 (9th Cir. 2007). " 'Absent binding precedent, we look to all available decisional law, including the law of other circuits and district courts, to determine whether the right was clearly established.' " *Id.* at

714 (quoting *Osolinski v. Kane*, 92 F.3d 934, 936 (9th Cir. 1996)).

Surprisingly, the majority skips this exercise entirely, failing to cite a single *T.L.O.* search case, aside from *T.L.O.* itself, that existed prior to October 2003. Although it is true that "officials can still be on notice that their conduct violates established law even in novel factual circumstances," *Hope v. Pelzer*, 536 U.S. 730, 741 (2002), this should not excuse us from first attempting to see whether any relevant cases exist. Earlier cases may provide authority that clearly establishes a right, but they may also create the legal ambiguity that allows a reasonable official to invoke the protections of the qualified immunity defense. *See Lum v. Jensen*, 876 F.2d 1385, 1389 (9th Cir. 1989) ("[T]he absence of binding precedent in this circuit plus the conflict between the circuits is sufficient, under the circumstances of this case, to undermine the clearly established nature of a right.").

As it turns out, there are multiple *T.L.O.* search cases from other circuits that the Safford Officials could have consulted. In *Cornfield ex rel. Lewis v. Consolidated High School District No. 230*, the Seventh Circuit upheld a strip search of a sixteen-year-old student who officials had reason to believe was "crotching" drugs. 991 F.2d 1316, 1323 (7th Cir. 1993).[23] A district court in Kansas found constitutional a search of a thirteen-year-old boy in which the school official "patted" the boy's crotch, removed the boy's socks and shoes, lowered his

---

[23]The majority opines that: " 'It does not require a constitutional scholar to conclude that a nude search of a thirteen-year-old child is an invasion of constitutional rights of some magnitude. More than that: it is a violation of any known principle of human dignity.' " Majority at 8449. This quote originated in a Seventh Circuit case, *Doe v. Renfrow*, 631 F.2d 91, 92–93 (7th Cir. 1980) (per curiam). Despite this precedent, the Seventh Circuit in *Cornfield* upheld a strip search, explaining that *Doe's* "sharp condemnation . . . stemmed from the fact that the strip search of Doe was executed without any individualized suspicion and without reasonable cause." 991 F.2d at 1324.

pants, and "searched the inside waist band of his boxer shorts." *Singleton v. Bd. of Educ.*, 894 F. Supp. 386, 389, 390–91 (D. Kan. 1995). The search followed an uncorroborated tip from an adult woman that the boy had taken $150.00 from her car. *Id.* at 388.

Although the majority criticizes the Redding search because there was no indication that she had pills in her underwear, the Sixth Circuit upheld a "strip search" of a high school student for an unknown drug, even though there was no evidence that the student actually possessed it under her clothes. *Williams ex rel. Williams v. Ellington*, 936 F.2d 881, 887 (6th Cir. 1991). Relating to the majority's discussion of student informers, the Eleventh Circuit found reasonable a search of a high school student's coat pockets for drugs based solely on the tip of a student who lacked any personal knowledge and was simply relaying information received from an anonymous third party. *C.B. ex rel. Breeding v. Driscoll*, 82 F.3d 383, 385, 388 (11th Cir. 1996).

Of course, each of these cases can be factually distinguished from the present one, but the Safford Officials had no way of knowing whether the different facts were constitutionally significant—that is, there was little indicating which facts were sufficient to uphold those searches, and which facts were necessary.

Not only are there cases that support the constitutionality of Redding's search, there are also cases that grant qualified immunity to officials who conducted unconstitutional *T.L.O.* searches.

In *Jenkins ex rel. Hall v. Talladega City Board of Education*, an en banc panel of the Eleventh Circuit was presented with "strip searches" of *eight-year-old* second graders that were undertaken to find *seven dollars* that had gone missing from a classmate's purse. 115 F.3d 821, 822 (11th Cir. 1997) (en banc). The court refused to even decide the constitutional-

ity of the searches, instead granting qualified immunity to the officers straight away because the *T.L.O.* test was too vague and unspecific to clearly establish law that could put the teachers on notice. *Id.* at 824–28.

The Eleventh Circuit dealt with another "strip search" in *Thomas ex rel. Thomas v. Roberts* (*Thomas I*), 261 F.3d 1160 (11th Cir. 2001), *vacated*, 536 U.S. 953 (2002), *reinstated*, (*Thomas II*) 323 F.3d 950, 952 (11th Cir. 2003). Following a reported disappearance of an envelope containing twenty-six dollars, a teacher and police officer (who happened to be there to teach a drug awareness class) conducted a mass search of an entire fifth grade class that was much more intrusive than the one Redding endured here. *Id.* at 1163–64.

The male officer took the boys to the bathroom and actually pulled his own pants and underwear down in front of them to show them what they were supposed to do. *Thomas I*, 261 F.3d at 1164. He then threatened them with suspension or jail if they failed to do as ordered. *Id.* It appears that the boys were required to get naked in front of each other, and one boy testified that two girls he knew saw him with his pants down because the officer had left the bathroom door open. *Id.* The girls had a similar experience with the female teacher, who forced them, in groups of two to five, to lower their pants and raise their dresses or shirts. Most were told to lift their bras and expose their breasts, and some were touched by the teacher in the process. *Id.*

Following the analysis set forth in *Acton*, the court held that the searches violated the students' Fourth Amendment rights. *Thomas I*, 261 F.3d at 1169. It nevertheless granted qualified immunity to the defendants, stating that "[i]f the salient question is whether *T.L.O.* gave the defendants 'fair warning' that a 'strip search' of an elementary school class for missing

money would be unconstitutional, then the answer must be 'no.' "[24] *Thomas II*, 323 F.3d at 954.

The search we confront today is less clearly unconstitutional than those described in *Jenkins* and *Thomas*. Yet the Eleventh Circuit effectively held in both cases that *T.L.O.* is too vague to enable school officials to determine whether a particular search will be considered reasonable.[25]

The majority disagrees with all this, finding that *T.L.O.* provided sufficient notice to Wilson. *T.L.O.* is obviously relevant in that it established "the legal framework." Majority at 8448. That framework, however, has been roundly criticized as too ill-defined to allow school officials to reasonably determine the constitutionality of possible searches. Put simply, *T.L.O.* will rarely supply enough guidance to "put the officer on notice that his conduct would be clearly unlawful." *Saucier*, 533 U.S. at 202.

This criticism was first voiced by the *T.L.O.* dissenters. Justice Brennan lamented that the "amorphous" reasonableness standard would "likely spawn increased litigation and greater uncertainty among teachers and administrators. . . . I cannot but believe that [schools] faced with interpreting what is permitted under the Court's new 'reasonableness' standard would be hopelessly adrift as to when a search may be permissible." *T.L.O.*, 469 U.S. at 365–66 (Brennan, J., dissenting).

---

[24]*Thomas II* was decided in March 2003, some seven months before the Redding search. It did not provide the necessary guidance to the Safford Officials, however, because it involved an *Acton* search (no individualized suspicion).

[25]In support of its constitutional discussion, the majority approvingly cites *Phaneuf v. Fraikin*, 448 F.3d 591 (2d Cir. 2006), which declared a "strip search" to be unconstitutional. Significantly, *Phanuef* was remanded to the district court to determine whether the defendants were entitled to qualified immunity, *id.* at 600, and the district court found that they were, *Phaneuf v. Cipriano*, No. 3:03CV0372, 2007 U.S. Dist. LEXIS 5963, at *17–*18 (D. Conn. Jan 25, 2007).

Justice Stevens concluded that the *T.L.O.* standard "is so open-ended that it may make the Fourth Amendment virtually meaningless in the school context." *Id.* at 385 (Stevens, J., dissenting). "The Court's effort to establish a standard that is, at once, clear enough to allow searches to be upheld in nearly every case, and flexible enough to prohibit obviously unreasonable intrusions of young adults' privacy only creates uncertainty in the extent of its resolve to prohibit the latter." *Id.* at 381.

Lower courts have echoed these observations. In *Thomas II*, the Eleventh Circuit stated that

> *T.L.O.'s* balancing test will, in most instances, call for school officials to speculate as to whether a court applying the balancing test to specific facts would find a search unreasonable. . . . [W]here the applicable legal standard is a highly general one, such as "reasonableness," preexisting caselaw that has applied general law to specific circumstances will almost always be necessary to draw a line that is capable of giving fair and clear notice that an official's conduct will violate federal law.

*Thomas II*, 323 F.3d at 954. *Jenkins* noted that *T.L.O.* did not even "apply its own test strictly to the facts presented in that case." *Jenkins*, 115 F.3d at 824. Although *T.L.O.* stated that a search must not be overly intrusive in light of the age and sex of the student and the nature of the infraction, "notably absent from the Court's discussion and conclusion" is any application of these considerations, and "[t]here is no illustration, indication, or hint as to *how* the enumerated factors might come into play when other concrete circumstances are faced by school personnel." *Id.* at 825.

> In the absence of detailed guidance, no reasonable school official could glean from these broadly-worded phrases whether the search of a younger or

older student might be deemed more or less intrusive; whether the search of a boy or girl is more or less reasonable, and at what age or grade level; and what constitutes an infraction great enough to warrant a constitutionally reasonable search or, conversely, minor enough such that a search of property or person would be characterized as unreasonable.

*Id.* at 825–26; *see also Beard v. Whitmore Lake Sch. Dist.*, 402 F.3d 598, 607 (6th Cir. 2005) ("[T]he [*T.L.O.*] Court did little to explain *how* the factors should be applied in the wide variety of factual circumstances facing school officials today."); *Williams*, 936 F.2d at 886 ("[T]he reasonableness standard . . . has left courts later confronted with the issue either reluctant or unable to define what type of official conduct would be subject to a 42 U.S.C. § 1983 cause of action.").

Today, this court brushes all these objections aside. Wilson, it explains, should have known better, for "[c]ommon sense and reason supplement the federal reporters." Majority at 8449.

It is of no small consequence to this analysis that three of the first four judges to address this issue found the Redding search to be constitutional, and two more judges on this en banc panel are of the same view. The majority feels that Wilson, with no legal training, should have known better.

Looking forward, the denial of qualified immunity may have the greatest impact on this circuit's schools. It is now clear that school officials who conduct *T.L.O.* searches that judges later think unreasonable will face trial and the possibility of damages, without any case law to guide them and no means of divining our views of "common sense and reason."

## IV.   *Saucier v. Katz*

Earlier this year, the Supreme Court granted certiorari in *Pearson v. Callahan*, 128 S. Ct. 1702 (2008) (mem.). In that

grant, the Court ordered the parties to brief and argue "[w]hether the Court's decision in *Saucier v. Katz*, 533 U.S. 194 (2001) should be overruled?" *Pearson*, 128 S. Ct. at 1702–03. For me, this case is a poster child for ending *Saucier's* "right first, clearly established later" requirement.

*Saucier* instructed courts to follow a "rigid order of battle" in cases involving claims of qualified immunity. *Brosseau v. Haugen*, 543 U.S. 194, 201–02 (2004) (Breyer, J., concurring) (internal quotation marks omitted). The threshold question is whether the facts show that an official's conduct violated a constitutional right. *Saucier*, 533 U.S. at 201. Only after having done so may the court then decide whether the right was clearly established. *Id.*

*Saucier* transformed what was once a best-practice approach to resolving qualified immunity cases into a mandatory, two-step inquiry. *Compare County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998) (describing the two-step inquiry as "the better approach"), *with Saucier*, 533 U.S. at 201. Whereas courts used to be able to skip the substantive constitutional question in cases where an official would clearly prevail on the qualified immunity issue, now we must labor to resolve the constitutional issue first.

Since it was decided, *Saucier* has been criticized by judges and scholars for having created a doctrine that is impractical, unduly burdensome, imprudent, and possibly unconstitutional. Citing some of these reasons, twenty-eight states filed a Supreme Court brief a few years ago urging that *Saucier* be abandoned. Brief for the State of Illinois et al. as *Amici Curiae* in Support of Petitioner, *Scott v. Harris*, 127 S. Ct. 1769 (2007) (No. 05-1631). There is no need to review these criticisms, as they have been well developed elsewhere. *See, e.g.*, *Brosseau*, 543 U.S. at 201–02 (Breyer, J., concurring); *Clement v. City of Glendale*, 518 F.3d 1090, 1093 n.4 (9th Cir. 2008) (Kozinski, C.J.) ("[T]he *Saucier* rule may lead to the publication of a lot of bad constitutional law that is, effec-

tively, cert-proof."); *Lyons v. City of Xenia*, 417 F.3d 565, 580–84 (6th Cir. 2005) (Sutton, J., concurring); Thomas Healy, *The Rise of Unnecessary Constitutional Rulings*, 83 N.C. L. Rev. 847, 872–82 (2005); Pierre N. Leval, *Judging Under the Constitution: Dicta About Dicta*, 81 N.Y.U. L. Rev. 1249, 1275–81 (2006).

As noted at the onset, this case is a particularly good example of why courts should not be *required* to resolve constitutional questions before finding that a defendant is entitled to qualified immunity.

The primary rationale behind a mandatory order of battle is that constitutional law will stagnate and constitutional rights will remain immature if courts do not take the time to develop the jurisprudence at every possible opportunity. With some constitutional doctrines, or with respect to some recurring scenarios, this may be true. Courts recognizing those situations would be wise to take the time to resolve the constitutional question.

In other situations, though, a doctrine is so inherently fact-driven that a precedent will provide very little helpful guidance. Today's case is illustrative. School officials in this circuit are now on notice that it is unconstitutional to require a thirteen-year-old female honor student to remove her outer garments and shake her bra and underwear, partially exposing her breasts and pelvic area, in front of two female administrators in a private room when the object sought is prescription-strength ibuprofen and the only direct evidence against her is the uncorroborated tip of a culpable classmate, and the girl searched has no disciplinary history but has been suspected of consuming and serving alcohol.

This precise holding is the only thing officials can rely on. There is no way of knowing in advance which of these facts could be altered, and to what degree, in order to find a search reasonable. This is not the majority's fault; it is a necessary

function of the *T.L.O.* reasonableness test, which eschews any clear rules in favor of a highly abstract balancing standard that is meant to reflect nothing more than "the dictates of reason and common sense." *T.L.O.*, 469 U.S. at 343.

Of course, because the majority found that a constitutional right was violated at a time when it was clearly established, *Saucier* did not affect the outcome of this case. As a member of the three-judge panel that found the search to be constitutionally reasonable, and as the author of today's dissent, I would have preferred to grant summary judgment based solely on the qualified immunity issue.

This would have been prudent as a constitutional matter, as we were forced to decide this case with a very limited evidentiary picture: the record is comprised of only five affidavits totaling eighteen pages.

Separate from the particulars of today's case, one additional comment about *Saucier* is in order. By recognizing qualified immunity for an official, a court necessarily holds that the official's mistake was reasonable because pre-existing law did not provide fair notice that the conduct was unlawful. *Brosseau*, 543 U.S. at 198 (per curiam). Such a ruling may be cold comfort, however, when that official is simultaneously branded a constitutional violator. Whatever thought that person may have had for future positions of public trust will likely be abandoned, for the public at large cannot be expected to have any familiarity with the qualified immunity doctrine. Overruling *Saucier*, if the Supreme Court chooses to do so, would enable us to spare the reputations and careers of competent officials who, while acting in good faith, do nothing more than commit a reasonable mistake.

When deciding *Pearson*, we can hope the Supreme Court will have an opportunity to consider the utility of *Saucier* in those areas of constitutional law that spawn a substantial number of relatively useless precedents. Today's decision,

along with the rest of *T.L.O.'s* progeny, would be a great place to start.

**Conclusion**

This is a difficult case. This dissent has approached the issues, as the majority has, "mindful of the limitations of the judicial function in controlling the myriad daily situations in which [school officials] and [students] confront each other on [campus]." *Terry*, 392 U.S. at 12. The majority understandably empathizes with Redding, giving due regard to the humiliation and degradation she suffered. And were it not for my different understanding of the principles articulated in *T.L.O.*, I might very well have joined today's opinion. That case, however, counsels deference to school officials. For that reason, I would find this search constitutional, and would certainly forgive the Safford Officials' mistake as reasonable.